### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN

CWD 50 LOUIS, L.L.C.,

               Plaintiff,

    v.

DISH WIRELESS, L.L.C.,

               Defendant.

Civil Action No. _____

### NOTICE OF REMOVAL

PLEASE TAKE NOTICE that in accordance with 28 U.S.C. §§ 1332, 1441, and 1446, Defendant DISH Wireless L.L.C. ("Defendant"), by and through its undersigned counsel, with full reservation of rights and defenses, respectfully removes the above titled action ("Action"), brought by Plaintiff CWD 50 Louis, L.L.C. ("Plaintiff") from the Circuit Court for the County of Kent, State of Michigan, to the United States District Court for the Western District of Michigan, Southern Division.  In support of removal, Defendant states the following:

### BACKGROUND

1.      On May 11, 2026, Plaintiff CWD 50 Louis, L.L.C. filed a Complaint in the Circuit Court for the County of Kent, State of Michigan, entitled *CWD 50 Louis, L.L.C. v. DISH Wireless, L.L.C.*  A true and correct copy of the Summons, the Complaint, and the other case initiating documents filed in this Action in the Circuit Court for the County of Kent, State of Michigan, which were served on Defendant on May 12, 2026 are attached hereto as Exhibit A ("Ex. A"). Exhibit A includes all the pleadings, processes, and orders served upon or by Defendant, or filed, in this matter before the Circuit Court for the County of Kent, State of Michigan to date.

2.      Plaintiff's Complaint alleges the following causes of action: (1) breach of contract, and (2) *quantum meruit*.  Ex. A at ¶¶ 27–35.

## THIS COURT HAS DIVERSITY JURISDICTION

3.     "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).

4.     This Court has diversity jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a), because (1) there is complete diversity between Plaintiff and Defendant as the Action is between citizens of different states, and (2) the amount in controversy exceeds $75,000, exclusive of interest, costs and fees.[1]

5.     Accordingly, this case is properly removed under 28 U.S.C. §§ 1332(a) and 1441, as this case falls within this Court's diversity jurisdiction.

### A.  The Parties Are Citizens of Different States

#### 1.  Plaintiff Is a Citizen of Michigan

6.     For purposes of diversity, "a limited liability company has the citizenship of each of its members."  *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009).

7.     Plaintiff CWD 50 Louis, L.L.C. is a Michigan limited liability company.  Ex. A at ¶ 1.  Upon information and belief, Plaintiff CWD 50 Louis, L.L.C. does not have members who are citizens of Colorado or Nevada.

8.     Therefore, Plaintiff is a citizen of only Michigan.

---

[1] Defendant's references to specific damage amounts are provided solely for establishing that the amount in controversy exceeds the jurisdictional minimum.  Defendant maintains that each of Plaintiff's claims is without merit and Defendant is not liable to Plaintiff.  No statement or reference contained herein shall constitute an admission of liability or a suggestion that Plaintiff will or actually could recover any damages based upon the allegations contained in the Complaint or otherwise.

### 2.    Defendant Is a Citizen of Nevada and Colorado

9.    Defendant DISH Wireless L.L.C. is a single-member limited liability company. The single member is non-party Neyland Networks LLC.

10.    Neyland Networks LLC is a single-member limited liability company.  The single member is non-party DISH Wireless Holding L.L.C.

11.    DISH Wireless Holding L.L.C. is a single-member limited liability company.  The single member is non-party DISH Network Corporation.

12.    DISH Network Corporation is a registered corporation incorporated under the laws of the state of Nevada.  At all relevant times, DISH Network Corporation's principal place of business and corporate headquarters have been located in Englewood, Colorado.  Thus, DISH Network Corporation is a citizen of Nevada and Colorado.  *Delphi Automotive Sys., LLC v. Segway Inc.*, 519 F. Supp. 2d 662, 665 (E.D. Mich. 2007) (a corporation is a citizen of "any State by which it has been incorporated and of the State where it has its principal place of business").

13.    Therefore, Defendant is a citizen of only Nevada and Colorado.  *See Delay*, 585 F.3d at 1005.

14.    Because, upon information and belief, Plaintiff is a citizen of only Michigan, and Defendant is a citizen of only Nevada and Colorado, complete diversity exists.  Thus, this Action may be removed pursuant to section 1332(a).

### B.  The Amount in Controversy is Satisfied

15.    Furthermore, this Court has diversity jurisdiction because the amount in controversy is satisfied.  While Defendant denies any and all liability to Plaintiff, the amount in controversy, based on Plaintiff's own allegations in the Complaint, is equal to or exceeds the sum or value of $143,236.58, exclusive of attorney's fees.  Ex. A at ¶¶ 31, 34.  *Woodmen of the World/Omaha Woodmen Life Ins. Soc. v. Scarbro*, 129 Fed. Appx. 194, 196 (6th Cir. 2005) ("It is

3

generally agreed in this circuit, that the amount in controversy should be determined 'from the perspective of the plaintiff, with a focus on the economic value of the rights he seeks to protect.'" (quoting *Buckeye Recyclers v. CHEP USA*, 228 F. Supp. 2d 818, 821 (S.D. Ohio 2002))).

## REMOVAL IS TIMELY

16. Defendant was served with the Summons and Complaint on May 12, 2026.

17. As required by 28 U.S.C. § 1446(b), Defendant files its Notice of Removal within 30 days of receipt of the Complaint. Accordingly, this Notice of Removal is timely filed. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) (30-day removal period begins to run on date of service).

18. No previous Notice of Removal has been filed or made with this Court for the relief sought herein.

## VENUE IS PROPER

19. This Action is properly removed to the United States District Court for the Western District of Michigan, Southern Division, which is "the district and division embracing" the Circuit Court for the County of Kent, State of Michigan, which is "the place where [the] action is pending." 28 U.S.C. § 1441(a).

## NOTICE TO THE STATE COURT AND PARTIES

20. Contemporaneously with the filing of this Notice of Removal in the United States District Court for the Western District of Michigan, Southern Division, and pursuant to 28 U.S.C. § 1446(d), written notice of this filing and any attendant supplementary papers required by this Court will be given to the parties, and a copy of the Notice of Removal will be filed with the Clerk of the Circuit Court for the County of Kent, State of Michigan.

4

**DEMAND FOR JURY TRIAL**

21.     Defendant DISH Wireless L.L.C. demands a trial by jury on all issues so triable.

**CONCLUSION**

22.     Defendant respectfully gives notice that this Action be removed from the Circuit Court for the County of Kent, State of Michigan to the United States District Court for the Western District of Michigan, Southern Division and that all proceedings hereinafter in this Action take place in the United States District Court for the Western District of Michigan.

Respectfully submitted this 11th day of June, 2026.

> */s/ Gina M. Dalfonso*
> GINA M. DALFONSO (P84046)
> Collins Einhorn Farrell PC
> 4000 Town Center, 9th Floor
> Southfield, MI 48075
> Tel.: (248) 351-5416
> Fax: (248) 355-2277
> Gina.Dalfonso@ceflawyers.com
>
> *Attorneys for Defendant DISH Wireless L.L.C.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

CWD 50 LOUIS, L.L.C.,

               Plaintiff,

    v.

DISH WIRELESS, L.L.C.,

               Defendant.

Civil Action No. _____

## CERTIFICATE OF SERVICE

I certify that on this 11th day of June, 2026, I caused to be filed the foregoing Notice of Removal with attached exhibits and accompanying Civil Cover Sheet via the CM/ECF system and will be subsequently served via email and U.S. mail upon the below named counsel of record, at the address stated below:

HONIGMAN LLP

Brandon J. Wilson
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7616
bwilson@honigman.com

Dated June 11, 2026

*/s/ Gina A. Dalfonso*
GINA M. DALFONSO
(P84046)

6

RECEIVED AND FILED KENT COUNTY
CIRCUIT COURT - 5/11/2026 4:13:00 PM

| Approved, SCAO | | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|---|
| **STATE OF MICHIGAN**<br>**JUDICIAL DISTRICT**<br>17th    **JUDICIAL CIRCUIT**<br>KENT    **COUNTY** | **SUMMONS** | | **CASE NUMBER**<br>26-20705-CBB |

| Court address | Court telephone number |
|---|---|
| 180 Ottawa Ave NW, Grand Rapids, MI 49503 | 616-635-5220 |

| Plaintiff's name, address, and telephone number<br>CWD 50 LOUIS, L.L.C. | v | Defendant's name, address, and telephone number<br>DISH WIRELESS, L.L.C.<br>c/o CSC Lawyers incorporating Service Company<br>3410 Belle Chase Way, Suite 600<br>East Lansing, Michigan 48911 |
|---|---|---|
| Plaintiff's attorney bar number, address, and telephone number<br>Brandon J. Wilson (P73042)<br>HONIGMAN LLP<br>2290 First National Building<br>660 Woodward Ave.<br>Detroit, MI 48226  (313) 465-7616 | | **HON. CURT A. BENSON**<br>**(P-38891)** |

Instructions: Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in  ☐ this court,  ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action  ☐ remains  ☐ is no longer   pending.

Summons section completed by court clerk.                    **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 5/12/2026 | 8/11/2026 | LISA POSTHUMUS LYONS |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (3/23)  **SUMMONS**                    MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105
SRA

RECEIVED AND FILED KENT COUNTY
CIRCUIT COURT - 5/11/2026 4:13:00 PM

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

CWD 50 LOUIS, L.L.C.,

      Plaintiff,

v.

DISH WIRELESS, L.L.C.,

      Defendant.

Case No. 2026-20705_____-CB
Hon. Curt A. Benson

---

Brandon J. Wilson (P73042)
HONIGMAN LLP
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7616
bwilson@honigman.com

*Attorneys for Plaintiff*

---

## COMPLAINT

There is no other civil action arising out of the same transaction or occurrence as alleged in this Complaint pending in this court nor has any such action previously been filed and dismissed after having been assigned to a judge.

### VERIFICATION FOR
### BUSINESS COURT ASSIGNMENT

Pursuant to MCR 2.112(O), the undersigned counsel hereby verifies that this case meets the statutory requirements to be assigned to the business court.

Plaintiff CWD 50 Louis, L.L.C. ("Plaintiff") sets forth its Complaint against Defendant

Dish Wireless, L.L.C., ("DISH"), as follows:

1

75439973.1

## THE PARTIES

1.      Plaintiff is a Michigan limited liability company with its registered office located at 50 Louis St. NW, Suite 410, Grand Rapids, Michigan 49503.

2.      DISH is a Colorado limited liability company with its registered office located at CSC-Lawyers Incorporating Service Company, 3410 Belle Chase Way, Suite 600, East Lansing, Michigan 48911, and which conducts business in Kent County, Michigan.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this matter because the amount in controversy is more than $25,000.00.

4.      This Court has general personal jurisdiction over DISH because (i) DISH irrevocably consented in Section 12.15 of the Lease (defined below) to jurisdiction in Kent County, Michigan (*see* MCL § 600.731(2)); and (ii) DISH carries on a continuous and systematic part of its general business in the State of Michigan. *See* MCL § 600.731(3).

5.      This Court is the proper venue because DISH conducts business in Kent County, Michigan.

## GENERAL ALLEGATIONS

6.      Plaintiff owns a mixed-use building located 50 Louis St. NW, Grand Rapids, Michigan 49503 (hereinafter the "Building").

### *The Lease*

7.      On August 30, 2023, Plaintiff, as landlord, and DISH, as tenant, entered into a Site Lease Agreement ("Lease") by which DISH agreed to lease a 2,500 square foot portion of the roof of the Building for installation of a cellular antenna (the "Premises"). *See* Ex. A – Lease Agreement.

2

75439973.1

8.     The initial "Term" of the Lease was 60 months (subject to DISH's renewal option) from the "Commencement Date" which was March 1, 2024. *See* Ex. A, § 2.2.

9.     The Lease requires DISH to pay rent to Plaintiff in monthly installments following the "Commencement Date" due on the fifth day of each month during the Term of the Lease. *Id.,* § 2.3.

10.     Any amount owed to Plaintiff and not paid timely by DISH is subject to a late charge of $250.00. *Id.*

11.     The Lease provides that an "Event of Default" shall occur if, *inter alia*, DISH fails to pay any amount to Plaintiff when and as due under the Lease. *Id.,* at § 8.1.

12.     In case of an "Event of Default," the Lease states that Plaintiff may "pursue any remedy or remedies the non-Defaulting Party may have at law or equity." *Id.,* § 8.2.

13.     The Lease further provides that "within sixty days following the expiration or termination (the "Equipment Removal Period"), Tenant will remove the Tenant's Equipment and surrender the Premises to Landlord in a condition similar to that which existed immediately prior to Tenant's Initial Installation." *Id.,* § 7.1.

14.     Section 12.15 of the Lease states that "If an action is brought by either Party for breach of any covenant and/or to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover its costs, expenses and reasonable attorneys' fees, both at trial and on appeal..." *Id.,* § 12.15.

### *Dish Installs Tenant's Equipment on the Premises*

15.     The Lease grants DISH permission to install, operate, repair and manage and maintain a wireless cellular antenna and related equipment in and on the Premises ("Tenant's Equipment"). *Id.,* § 3.1.

3

75439973.1

16.    The Lease also states that DISH shall have access to the Premises at all times. *Id.,* § 3.2.

17.    After the Effective Date of the Lease, DISH installed "Tenant's Equipment" in and on the Premises and thereafter was provided access to the Premises.

### *The Lease Default*

18.    In November 2025, DISH stopped paying Rent when and as due under the Lease.

19.    On around February 5, 2026, Plaintiff commenced summary eviction proceedings in the 61st District Court, Case No. 26-24-LT, in order to recover possession of the Premises.

20.    Plaintiff demanded that DISH be ordered to pay all amounts then due and owing under the Lease, or to vacate the Premises.

21.    DISH did not pay all amounts owed under the Lease, and a Judgment of Possession was entered by the District Court on March 13, 2026.

22.    DISH has been in material breach of the Lease since at least November, 2025 and has not paid all amounts owed to Plaintiff as required under the Lease.

23.    DISH also has not removed any of Tenant's Equipment installed in and on the Premises in breach of Section 7.1 of the Lease.

24.    The estimated cost to remove Tenant's Equipment is $62,031.00.

25.    The following amounts are or will be owed to Plaintiff pursuant to the Lease:

| *Charge* | *Amount* |
| --- | --- |
| Back rent through May 1, 2026 | $12,067.10 |
| Cost of Removal of Tenant's Equipment | $62,031.00 |
| Costs | $124.98 |
| Attorney Fees | $6,982.50 |
| **TOTAL** | **$81,205.58** |

26.    The amounts above do not include rent, interest, costs and attorney fees and other amounts due under the Lease which will come due and continue to accrue after May 1, 2026.

4

## COUNT I – BREACH OF THE LEASE

27. Plaintiff incorporates the allegations set forth above by reference with the same force and effect as if fully repeated herein.

28. The Lease is a valid and binding contract between Plaintiff and DISH.

29. Plaintiff performed its obligations under the Lease.

30. DISH first materially breached the Lease by, among other things, failing to pay rent and late fees when and as due under the Lease and by failing to remove Tenant's Equipment from the Premises.

31. Plaintiff has been damaged as a result of DISH's breach of the Lease.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against DISH in an amount not less than $81,205.58, plus rent, interest, costs, attorney fees and other amounts due under the Lease which will come due and continue to accrue, and for such further and additional relief as may be fair and just under the circumstances.

## COUNT II – QUANTUM MERUIT

32. Plaintiff incorporates the allegations set forth above by reference with the same force and effect as if fully repeated herein.

33. DISH installed Tenant's Equipment in and on the Premises, stopped paying rent and other amounts when due under the Lease, abandoned the Premises, but has failed to remove Tenant's Equipment from the Premises.

34. As alleged herein, the estimated cost to remove Tenant's Equipment from the Premises is $62,031.00.

35. Plaintiff will be damaged as a result of DISH's failure to remove Tenant's Equipment from the Premises.

5

75439973.1

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in its favor and against DISH in an amount not less than $62,031.00, plus interest, costs, and attorney fees, and for such further and additional relief as may be fair and just under the circumstances.

Respectfully submitted,

HONIGMAN LLP

Dated: May 11, 2026

/s/ Brandon J. Wilson
    Brandon J. Wilson (P73042)
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7616
bwilson@honigman.com

*Attorneys for Plaintiff*

6

75439973.1

# EXHIBIT A

## SITE LEASE AGREEMENT

This Site Lease Agreement (the "**Agreement**") is made and effective as of the date the last Party executes this Agreement (the "**Effective Date**"), by and between CWD 50 Louis, L.L.C., a Michigan limited liability company, having a place of business at c/o CWD Real Estate Investment, 50 Louis Street, NW, Grand Rapids, Michigan 49503 ("**Landlord**"), and DISH Wireless L.L.C., a Colorado limited liability company having a place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112 ("**Tenant**," and together with Landlord, the "**Parties**," each a "**Party**").

### WITNESSETH:

**1. Definitions.**

"**Affiliate(s)**" means, with respect to a Party, any person or entity, directly or indirectly, controlling, controlled by, or under common control with such Party, in each case for so long as such control continues. For purposes of this definition, "control" shall mean (i) the ownership, directly or indirectly, or at least fifty percent (50%) of either: (a) the voting rights attached to issued voting shares; or (b) the power to elect fifty percent (50%) of the directors (or other similar positions) of such entity, or (ii) the legal ability to direct the actions of the entity. Notwithstanding the preceding, for purposes of this Agreement, EchoStar Corporation and its direct and indirect subsidiaries shall not be deemed to be "Affiliates" of Tenant unless after the Effective Date any such entity qualifies as a direct or indirect subsidiary of DISH Network Corporation.

"**Applicable Law**" means any applicable federal, state or local act, law, statute, ordinance, building code, rule, regulation or permit, or any order, judgment, consent or approval of any Governmental Authority having jurisdiction over the Property, the Parties or this Agreement.

"**Governmental Authority**" means any: (i) federal, state, county, municipal, tribal or other local government and any political subdivision thereof having jurisdiction over the Property, the Parties or this Agreement; (ii) any court or administrative tribunal exercising proper jurisdiction; or (iii) any other governmental, quasi-governmental, self-regulatory, judicial, public or statutory instrumentality, authority, body, agency, bureau or entity of competent jurisdiction.

"**Installation**" means the installation of Tenant's Equipment (defined in Section 3.1) at the Premises.

"**Permitted Modifications**" means adding, replacing, or modifying Tenant's Equipment within the Premises in accordance with Section 3.3.

"**Property**" means that certain parcel of real property upon which the Structure is located.

"**Structure**" means that certain structure of which the Premises are a part.

**2. Premises, Term, Rent and Contingencies.**

2.1     Premises. Landlord is the owner of the Property located at 50 Louis Street, NW, Grand Rapids, Michigan 49503, as more particularly described in Exhibit A. Landlord leases to Tenant approximately two thousand five hundred (2,500) square feet of space located on the roof of the Structure located approximately as depicted in Exhibit B, referred to as the "Premises". Landlord also grants to Tenant, to support the operation of Tenant's Equipment: (a) the right to use any Landlord's available electrical systems and/or fiber installed at the Property: and (b) any easements on, over, under, and across the Property for utilities, fiber and access to the Premises as provided below. Landlord agrees that providers of existing utility or fiber services may use such easement(s) and/or available conduit(s) for the installation of any equipment necessary to provide utility or fiber service to Tenant's Equipment.  If the existing

Site Number: DEGRR00145B                    1                    Confidential & Proprietary
Market: Detroit                                                                    Lease Version: 1.0

'utility or fiber sources located within the Premises or on the Property are insufficient for Tenant's Permitted Use, Landlord agrees to grant Tenant and/or the applicable third party utility or fiber provider the right, at Tenant's sole cost and expense, to install such utilities or fiber on, over and/or under the Property as is necessary for Tenant's Permitted Use; provided that Landlord and Tenant shall mutually agree on the location of such installation(s) and Landlord and the utility provider mutually agree on an access agreement. Notwithstanding the foregoing, Tenant agrees to use the existing utility providers that are currently providing services on the Property for the provision of utilities to the Premises. In the event that Tenant wishes to use a utility provider that is not currently providing services on the Property, such utility provider shall be required to contact Landlord for the purposes for entering into a mutually agreed upon access agreement between such provider and Landlord.

2.2    Term. This Agreement shall be effective as of the Effective Date. The initial term of this Agreement (the "Initial Term") will commence on the first (1ˢᵗ) day of the month following the earlier of (i) commencement of Tenant's installation or (ii) one hundred (180) days after the Effective Date (the "Commencement Date"), and will expire on the last day of the month that is sixty (60) months after the Commencement Date unless terminated sooner, renewed or extended in accordance with this Agreement. The Initial Term shall automatically renew for up to four (4) additional terms of sixty (60) months each (each, a "Renewal Term" and together with the Initial Term, the "Term"). However, Tenant may, in Tenant's sole and absolute discretion, elect not to renew at the end of the then-current Term by giving Landlord Notice (defined in Section 12.11) at least ninety (90) days prior to the end of the then-current Term. The Parties agree that, subject to the Contingencies, this Agreement constitutes a binding and valid obligation on each Party and that each Party has vested rights in this Agreement as of the Effective Date.

2.3    Rent. Beginning on the Commencement Date and continuing through the Term of this Agreement, Tenant shall pay Landlord rent for the Premises ("Rent") in the amount of One Thousand Seven Hundred Fifty and 00/100 Dollars ($1,750.00) per month. The first Rent payment shall be made within twenty (20) business days of the Commencement Date, with subsequent rent payable by the fifth day of each month. On each anniversary of the Commencement Date, the Rent shall be automatically increased by two percent (2%) (and four percent (4%) during the third and fourth Renewal Term) of the then-current Rent. Payments shall be delivered by electronic payment. All payments (i) for any fractional month shall be prorated based upon the number of days during such month that the payment obligation was in force; (ii) not paid within five (5) days of when due shall incur a one-time late charge of two hundred fifty and 00/100 Dollars($250.00) if payment is not received within an additional five (5) days after Notice to Tenant (except such Notice shall be required no more than once per calendar year) and (iii) if not paid within ten (10) days of Notice that payment is past due, shall accrue interest from time to time until paid in full at rate of five percent (5%) above the Prime Rate of interest as published by The Wall Street Journal (or such other source reasonably selected by from Landlord). Tenant shall require receipt of a validly completed IRS approved W-9 form (or its equivalent) prior to paying any Rent or any other amount(s) due under this Agreement.

2.4    Contingencies. The Parties acknowledge and agree that Tenant's ability to lawfully use the Premises is contingent upon Tenant obtaining all certificates, permits, approvals and other authorizations that may be required by any Governmental Authority in accordance with Applicable Law (collectively, the "Governmental Approvals"). Tenant will endeavor to obtain all such Governmental Approvals promptly. Landlord hereby authorizes Tenant, at Tenant's sole cost and expense, to file and submit for Governmental Approvals. Landlord shall: (a) cooperate with Tenant at Tenant's expense in Tenant's efforts to obtain such Governmental Approvals; (b) promptly execute and deliver all documents necessary to obtain and maintain the Government Approvals; and (c) not take any action (other than as otherwise allowed by this Agreement) that would materially and adversely affect Tenant's ability to obtain and/or maintain the Governmental Approvals. If: (i) any application for Governmental Approvals is rejected, conditioned, materially delayed or otherwise not approved for any or no reason; or (ii) Tenant determines, in Tenant's sole and absolute discretion, that such Governmental Approvals cannot be obtained in a timely and commercially reasonable manner (clauses (i) and (ii) collectively, the "Contingencies"), then, Tenant shall have the right in its sole and absolute discretion to terminate this Agreement

Site Number: DEGRR00145B                2
Market: Detroit                                          Lease Version: 1.0

Immediately upon Notice to Landlord, without penalty or further obligation to Landlord (or Landlord's Affiliates, employees, officers, agents or lenders). If Tenant has not so terminated this Agreement within one hundred eighty (180) days of the Effective Date, the Contingencies shall be conclusively deemed satisfied or waived by Tenant. If, following the Commencement Date, and through no fault of Tenant, any Governmental Approval issued to Tenant is canceled, expires or lapses and cannot be renewed, or is otherwise withdrawn or terminated by the applicable Governmental Authority, then Tenant shall have the right in its sole and absolute discretion to terminate the Term of this Agreement upon one hundred eighty (180) days' Notice to Landlord. If this Agreement is terminated, this Agreement shall be of no further force or effect (except as set forth to the contrary herein).

**3. Use, Access and Modifications to Tenant's Equipment.**

     **3.1**    Tenant's Permitted Use. Subject to Section 3.3, from and after the Contingencies have been satisfied or waived by Tenant and throughout the Term, Landlord agrees that Tenant may use the Premises for the purpose of the installation, operation, maintenance and management of a telecommunications facility (including, without limitation, equipment designed to transmit and receive radio frequency signals) (collectively, "Tenant's Equipment"), which shall include the right to replace, repair, add, or otherwise modify any or all of Tenant's Equipment and the frequencies over which Tenant's Equipment operates ("Tenant's Permitted Use"). Landlord acknowledges and agrees that if radio frequency signage and/or barricades are required by Applicable Law, Tenant shall have the right to install the same on or near the Premises or on or near the roof access doorway so long as signage/barricades are not visible from ground level and in compliance with the terms and conditions of this Agreement; provided, however, that if signage/barricades are required elsewhere on the Property, such signage/barricades are subject to Landlord's approval, which shall not be unreasonably withheld, conditioned or delayed.

     **3.2**    Access. Commencing on the Effective Date and continuing throughout the Term, provided Tenant provides advance notice to Landlord (which may be telephonic and need not comply with Section 12.11), Tenant, its employees, agents and contractors shall have unrestricted access to the Premises twenty-four (24) hours per day, seven (7) days per week and at no additional cost or expense to Tenant.

     **3.3**    Landlord Approval of, and Modifications to Tenant's Equipment. Landlord approves the initial installation of the Tenant's Equipment described and/or depicted on Exhibit C. After Tenant's initial installation, Tenant may make Permitted Modifications, including those which allow Tenant to: (i) modify or add additional technologies; and (ii) modify or add equipment within the Premises; in either case, without incurring any increase in the then-current Rent, or other modification of the terms and conditions set forth in this Agreement. For any modification or addition that is not a Permitted Modification or that materially alters the appearance, method or attachment to the Structure's roof or materially affects the Structure's roof or systems (including resulting in any live loads exceeding fifty (50) pounds per square foot), Tenant shall seek Landlord's approval of Tenant's installation plans and specifications prior to commencing any such addition or modification. All work by or for Tenant at the Property shall be performed consistent with Landlord's Construction Rules and Regulations attached as Exhibit D.

**4. Utilities, Liens and Taxes.**

     **4.1**    Utilities. Tenant may use and make reasonable modifications to the Premises' electrical system as approved by Landlord to accommodate the electrical requirements of Tenant's Equipment at Tenant's sole cost and expense. Tenant shall meter electrical service to the Premises and arrange for service with (and promptly pay for such service to) the applicable public utility.

     **4.2**    Liens. Tenant will use commercially reasonable efforts to prevent any lien from attaching to the Structure or any part thereof. If any lien is filed purporting to be for labor or material furnished or to be furnished at the request of Tenant, then Tenant shall do all acts necessary to discharge such lien by payment, satisfaction or

Site Number: DEGRR00145B

Market: Detroit

Confidential & Proprietary

Lease Version: 1.0

posting of bond (in accordance with Applicable Law) within ninety (90) days of receipt of Tenant's notice of the same; provided, if Landlord notifies Tenant that any such lien is hindering any sale or financing involving any of the Property, such ninety (90) days shall be reduced to thirty (30) days.

4.3     Taxes. Landlord shall pay all taxes that accrue against the Structure during the Term. If any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the taxing authority. Tenant shall be liable for all taxes against Tenant's personal property or Tenant's fixtures placed in the Premises ("Tenant Taxes"), whether levied or assessed against Landlord or Tenant. Landlord shall reasonably cooperate with Tenant, at Tenant's expense, in any appeal or challenge to Tenant Taxes. If, as a result of any appeal or challenge by Tenant, there is a reduction, credit or repayment received by Landlord for any Tenant Taxes previously paid by Tenant, Landlord agrees to promptly reimburse to Tenant the amount of said reduction, credit or repayment.

## 5. Interference and Relocation of Tenant's Equipment.

5.1     Interference – General. Tenant shall ensure that Tenant's Equipment does not cause Interference (as defined below) with any equipment installed at the Structure as of the Effective Date. Following the Effective Date and during the Term, Landlord shall (a) in all leases and other occupancy agreements involving space at or use of the Property, Landlord shall prohibit the tenant or occupant from materially interfering with any of Tenant's Equipment to the extent such equipment was being operated at the Structure when such tenant or occupant first operates its equipment which Tenant claims is causing such Interference; and (b) not install or approve (where it has the discretion to not approve) others to install any structure or equipment which materially blocks or otherwise materially interferes with any transmission or reception by Tenant's Equipment ("Interference"). If, due to Landlord's breach of this Section, Interference occurs and continues for a period more than forty-eight (48) hours following Landlord's receipt of notification from Tenant thereof, Landlord shall cause any interfering party to cease operating, and/or relocate, the source of Interference, or to reduce the power sufficiently to minimize the Interference until such Interference can be remedied.

5.2     Interference – Specific. Tenant acknowledges that New Cingular Wireless PCS, LLC ("NCW"), uses a portion of the Structure for the transmission and reception of communications signals. Tenant shall not materially interfere with any of NCW's equipment at the Structure to the extent such equipment was being operated at the Structure when Tenant first operates its equipment which NCW claims is causing such interference. Under this Section 5.2, such "interference" may include, but is not limited to, any use on the Property that causes any material electronic or physical obstruction with, or degradation of, the communications signals from NCW's communication facility at the Structure (however, "interference" under this Section does not include anything occurring or existing when any change in the NCW's communication facility made by NCW results in the interference occurring). As required by Landlord's lease with NCW, Landlord shall before the Effective Date notify NCW in writing that Landlord is granting Tenant the right to install and operate communications equipment at the Structure.

## 6. Maintenance and Repair Obligations.

6.1     Landlord Maintenance of the Structure. Landlord represents and warrants that, as of the Effective Date, the Structure, the Structure's systems and all structural elements of the Structure are in compliance with Applicable Law. Throughout the Term of this Agreement, Landlord shall maintain, at its sole cost and expense, the Structure and the Property (but not Tenant's Equipment located thereon or any electric meter exclusively serving the Premises) in good operating condition. Landlord shall not have any obligation to maintain, repair or replace Tenant's Equipment (or any Structure systems to the extent exclusively serving the Premises) except to the extent required due to the wrongful or negligent acts and/or omissions of Landlord or Landlord's

 

agents or contractors. In addition, Tenant may take all actions necessary, in Tenant's reasonable discretion to secure and/or restrict access to Tenant's Equipment within the Premises.

6.2    Tenant Maintenance of Tenant's Equipment. Tenant assumes sole responsibility for the maintenance, repair and/or replacement of Tenant's Equipment and any Structure systems to the extent exclusively serving the Premises, except as set forth in Section 6.1. Tenant agrees to perform all maintenance, repair or replacement of Tenant's Equipment ("Tenant Maintenance") in accordance with Applicable Law, and in a good condition and repair. Tenant shall not be permitted to conduct Tenant Maintenance in a manner that would increase the size of the Premises.

## 7. Surrender and Hold Over.

7.1    Surrender. Within sixty (60) days following the expiration or termination (the "Equipment Removal Period"), Tenant will remove the Tenant's Equipment and surrender the Premises to Landlord in a condition similar to that which existed immediately prior to Tenant's initial Installation, normal wear and tear excepted. The Parties acknowledge and agree that Rent will accrue during the Equipment Removal Period. However, if Tenant does not so surrender the Premises during the Equipment Removal Period, Tenant will be deemed to be in Hold Over (as defined in Section 7.2 below) until Tenant surrenders the Premises as required above. Tenant shall have the right to access the Premises or remove any or all of Tenant's Equipment from the Premises at any time during the Term or the Equipment Removal Period.

7.2    Hold Over. If Tenant occupies the Premises beyond the Equipment Removal Period without Landlord's written consent ("Hold Over"), Tenant will be deemed to occupy the Premises on a month-to-month basis, terminable by either Party on thirty (30) days' Notice to the other Party. All of the terms and provisions of this Agreement shall be applicable during that period, except that Tenant shall pay Landlord a rental fee equal to one hundred twenty-five percent (125%) of the monthly Rent applicable at the expiration or termination of the Agreement, prorated for the number of days of such hold over.

## 8. Default, Remedies and Termination.

8.1    Default. If any of the following events occur during the Term (each a "Default"), then the non-Defaulting Party may elect one or more of the remedies set forth below in this Section 8 or seek any other remedy available: (a) Tenant's failure to make any payment required by this Agreement within fourteen (14) days after receipt of Notice from the Landlord of such failure to pay (which Notice shall also serve as the statutory Notice to Quit for Michigan Summary Proceedings); (b) failure by either Party to observe or perform any other provision of this Agreement where such failure continues for a period of thirty (30) days after Notice thereof from the non-Defaulting Party and the Defaulting Party has failed to cure such Default (or such longer period of time as reasonably required provided the Defaulting Party promptly commences and diligently proceeds to cure) (c) either Party files a petition in bankruptcy or insolvency or for reorganization or arrangement under the bankruptcy laws or under any insolvency act of any state, or admits the material allegations of any such petition by answer or otherwise, or is dissolved or makes an assignment for the benefit of creditors; and/or (d) involuntary proceedings under any such bankruptcy law or insolvency act or for the dissolution of either Party are instituted against either Party, or a receiver or trustee is appointed for all or substantially all of the property of either Party, and such proceeding is not dismissed, or such receivership or trusteeship vacated within sixty (60) days after such institution or appointment.

8.2    Remedies. Upon the occurrence of any uncured Default, the non-Defaulting Party may thereafter terminate immediately upon Notice to the other Party without prejudice to any other remedies and pursue any remedy or remedies the non-Defaulting Party may have at law or in equity.

8.3    Termination. Tenant shall have the right to terminate the Term of this Agreement  upon (i) sixty (60) days prior written Notice to Landlord due to any changes in Applicable Law which prohibit Tenant's ability to operate Tenant's Equipment at the Premises, (ii) one hundred eighty (180) days prior written Notice to Landlord if Tenant, in its sole discretion, determines that Tenant's Permitted Use of the Premises is obsolete or unnecessary; or (ii) upon thirty (30) days prior written Notice to Landlord beyond applicable cure period as set forth in Section 5.1 due to Landlord's, its tenant's, or other third party's installation at the Property of any structure, equipment, or other item which materially prevents Tenant from being able to use the Tenant Equipment for Tenant's Permitted Use.

**9. Limitation of Liability and Indemnification.**

9.1    Limitation of Liability. EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH BELOW IN THIS SECTION 9, NEITHER PARTY NOR ANY OF ITS AGENTS, CONTRACTORS OR EMPLOYEES, SHALL BE LIABLE TO THE OTHER PARTY OR ANY PERSON CLAIMING THROUGH THAT PARTY FOR ANY EXEMPLARY, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR ANY CAUSE WHATSOEVER, INCLUDING, WITHOUT LIMITATION, CLAIMS CAUSED BY OR RESULTING FROM THE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT PARTY, ITS AGENTS, CONTRACTORS OR EMPLOYEES.

9.2    Tenant's Indemnity. Except to the extent caused by the breach of this Agreement by Landlord or the acts or omissions of Landlord or its officers, agents, employees, contractors, or any other person or entity for whom Landlord is legally responsible ("Landlord's Representatives"), Tenant shall defend, indemnify and hold Landlord and its officers, directors, shareholders, employees, agents and representatives harmless from and against any and all claims, demands, litigation, settlements, judgments, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (individually or collectively, a "Claim") arising directly or indirectly out of: (i) any act or omission of Tenant or its officers, agents, employees, contractors, or any other person or entity for whom Tenant is legally responsible ("Tenant's Representatives"); (ii) a breach of any representation, warranty or covenant of Tenant contained or incorporated in this Agreement; and/or (iii) the generation, possession, use, storage, presence, release, spill, treatment, transportation, manufacture, refinement, handling, production and/or disposal of Hazardous Substances in, on, about, adjacent to, under or near the Premises, the Structure and/or the Property, and/or any contamination of the Premises, the Structure and/or the Property by any Hazardous Substance, but only to the extent caused by Tenant or Tenant's Representatives.

9.3    Landlord's Indemnity. Except to the extent caused by the breach of this Agreement by Tenant or the acts or omissions of Tenant or Tenant's Representatives, Landlord shall defend, indemnify and hold Tenant, its officers, directors, shareholders, employees, agents and representatives harmless from and against any and all Claims arising directly or indirectly out of: (i) any act or omission of Landlord or Landlord's Representatives; (ii) a breach of any representation, warranty or covenant of Landlord contained or incorporated in this Agreement; and/or (iii) the generation, possession, use, storage, presence, release, spill, treatment, transportation, manufacture, refinement, handling, production and/or disposal of Hazardous Substances in, on, about, adjacent to, under or near the Premises, the Structure and/or the Property, and/or any contamination of the Premises, the Structure and/or the Property by any Hazardous Substance, but only to the extent caused by Landlord or Landlord's Representatives.

9.4    Indemnification Procedure. The Party seeking indemnification (the "Indemnified Party") shall promptly send Notice to the Party from whom indemnification is being sought (the "Indemnifying Party") of the claim or suit for which indemnification is sought. The Indemnified Party shall not make any admission as to liability or agree to any settlement of or compromise any claim without the prior written consent of the Indemnifying Party. The Indemnified Party shall, at the Indemnifying Party request and expense, give the Indemnifying Party all reasonable assistance in connection with those negotiations and litigation.

**10. Insurance.**

10.1    Landlord Obligations. Throughout the Term, Landlord shall maintain, at Landlord's sole cost and expense, the following insurance coverage Commercial General Liability (with a contractual liability endorsement) written on an occurrence basis with single limits of at least $2,000,000. All such policies shall be endorsed to include Tenant as an additional insured. Subject to the policy minimums set forth above in this Section 10.1, the insurance required of Landlord hereunder may be maintained by a blanket or master policy that includes properties other than the Property.

10.2    Tenant Obligations. Throughout the Term, Tenant shall maintain, at Tenant's sole cost and expense, the following insurance coverage: (i) workers' compensation insurance with no less than the minimum limits required by Applicable Law; (ii) employer's liability insurance with such limits as required by Applicable Law; (iii) Commercial General Liability (with a contractual liability endorsement) written on an occurrence basis with single limits of at least $2,000,000. All such policies shall be endorsed to include Landlord and Landlord's property manager as additional insureds (with coverage extended to an additional insured to be at least as broad as that extended to the named insured). Throughout the Term, Tenant shall also insure (or self-insure all or in part) all Tenant's Equipment and its other personal property kept on the Premises against loss or damage under a policy of fire and extended coverage insurance in its full replacement cost with deductibles and exclusions typically obtained by similar businesses. Tenant shall furnish Landlord with a certificate of insurance that all such insurance is in effect. Each policy shall provide that Landlord (and each additional insured) be given thirty (30) days' Notice of cancellation (or ten (10) days' Notice of non-payment of premium) of the policy.

10.3    Insurance Requirements. All policies required by this Section 10 shall be issued by insurers that are (1) licensed to do business in the state in which the Property and/or Structure are located, and (2) rated A- or better by Best's Key Rating Guide.

10.4    Waiver of Subrogation. To the fullest extent permitted by law, Landlord and Tenant for themselves and any and all parties claiming under or through them, including, without limitation, their respective insurers (with Tenant considered the insurer for any self-insured amounts), hereby mutually release and discharge each other and the other's Affiliates, and their respective officers, directors, shareholders, agents, employees, contractors, and/or any other person or entity for whom a Party is legally responsible from any claims for damage to any person or to the Premises or Tenant's Equipment or any other real or personal property that are or are claimed to have been caused by or result from risks insured against under any insurance policies carried by the waiving party and in force at the time of such damage (or required by this Agreement to be carried regardless of whether in force and with Tenant for this purpose considered the insurer for any self-insured amounts) and hereby waive any right of subrogation that might otherwise exist in or accrue to any person on account thereof. All policies required to be carried by either Party herein shall contain an endorsement in favor of the other Party waiving the insurance company's right of subrogation against such other Party. THIS RELEASE SHALL APPLY EVEN IF THE LOSS OR DAMAGE IS CAUSED BY THE FAULT OR NEGLIGENCE OF A PARTY HERETO OR BY ANY PERSON FOR WHICH SUCH PARTY IS RESPONSIBLE. EACH PARTY AGREES TO NOTIFY ITS INSURANCE CARRIER(S) OF THIS PROVISION.

**11. Representations and Warranties; Hazardous Substances.**

11.1    Representations and Warranties. Landlord represents, warrants and covenants that, as of the Effective Date: (a) Landlord has the right and authority to execute and perform this Agreement; (b) there are no title matters affecting the Property that prevent the use of the Premises for Tenant's Permitted Use; (c) the Structure and the Premises are in good repair; and (d) subject to the terms of this Agreement, Tenant's use and quiet enjoyment of the Premises shall not be disturbed.

11.2    Hazardous Substances – Landlord. Landlord will comply with all Applicable Law in connection with any substances brought on to the Property and/or Structure by Landlord or Landlord's Representatives that are

identified as toxic or hazardous by any Applicable Law, ordinance or regulation ("Hazardous Substance"). Landlord is responsible for the remediation of any Hazardous Substances as per Applicable Law. Landlord understands and agrees that notwithstanding anything contained in this Agreement to the contrary, in no event shall Tenant have any liability whatsoever with respect to any Hazardous Substance that was on, about, adjacent to, under or near the Structure prior to the Effective Date, or that was generated, possessed, used, stored, released, spilled, treated, transported, manufactured, refined, handled, produced or disposed of on, about, adjacent to, under or near the Property and/or Structure by: (1) Landlord, its agents, employees, contractors or invitees; or (2) any third party who is not an employee, agent, contractor or invitee of Tenant.

11.3    Hazardous Substances – Tenant. Tenant will comply with all Applicable Law in connection with any Hazardous Substance brought on to the Property and/or Structure by Tenant or Tenant's Representatives.

11.4    Statutory Disclosure. Landlord discloses to Tenant as required by MCL Section 324.20116 that the Property is a "facility" as defined in MCL Section 324.20101 because the soils and groundwater under the foundation of the Structure were tested and found to contain metal contaminants in concentrations exceeding Michigan's Residential Generic Clean Up Criteria and Landlord disclosed such to the State of Michigan by filing a Baseline Environmental Assessment dated in March of 2011. On request, Landlord will provide Tenant a copy of that assessment.

## 12. Miscellaneous.

12.1    Assignment. Tenant may not assign or otherwise transfer any of its rights or obligations under this Agreement or sublease the Premises to any third party without the prior written approval of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Tenant may, with Notice to Landlord thereafter, assign or transfer its rights and/or obligations under the Agreement to: (i) an Affiliate; (ii) a successor entity to its business, whether by merger, consolidation, reorganization or by sale of all or substantially all of its assets or stock; (iii) any entity in which a Party or its Affiliates have any direct or indirect equity investment; and/or (iv) any other entity directly or indirectly controlling, controlled by or under common control with any of the foregoing, and in each case, such assignment, transfer or other such transaction shall not be considered an assignment under this Section 12.1 requiring consent and Landlord shall have no right to delay, alter or impede such assignment or transfer.

12.2    Rights Upon Sale of Property or Structure. Should Landlord, at any time during the Term, sell or transfer all or any part of the Property or the Structure to a purchaser other than Tenant, such transfer shall be subject to this Agreement and Landlord shall require any such purchaser or transferee to recognize Tenant's rights under the terms of this Agreement in a written instrument signed by Landlord and the third party transferee whereupon Landlord shall be released from its obligations to Tenant under this Agreement. If Landlord completes any such transfer without executing such a written instrument, then Landlord shall not be released from its obligations to Tenant under this Agreement, and Tenant shall have the right to look to Landlord and the third party for the full performance of this Agreement.

12.3    Subordination and Non-Disturbance. This Agreement shall be subordinate to any mortgage, deed of trust, or other security agreement (each a "Mortgage") by Landlord which, from time to time, may encumber all or part of the Property; provided, however, the lender under every such Mortgage shall, in the event of a foreclosure of Landlord's interest, recognize the validity of this Agreement and Tenant's right to remain in occupancy of and have access to the Premises, as long as no Default by Tenant exists under this Agreement. If the Property is encumbered by a Mortgage, then either Party shall, promptly following the other Party's request, execute and deliver to the requesting Party a commercially reasonable form of non-disturbance agreement, in recordable form, for each such Mortgage.

**12.4    Condemnation.** If all or any portion of the Premises is condemned, taken by a Governmental Authority or otherwise appropriated by the exercise of the right of eminent domain or a deed or conveyance in lieu of eminent domain (each, a "Taking"), either Party hereto shall have the right to terminate this Agreement immediately upon Notice to the other Party. If either Party so elects to terminate this Agreement, the Rent set forth herein shall be abated, and Tenant's liability therefor will cease as of the date of such Taking, this Agreement shall terminate as of such date, and any prepaid Rent shall be returned to Tenant. If this Agreement is not terminated as herein provided, then it shall continue in full force and effect, and Landlord shall, within a reasonable time after possession is physically taken by the condemning authority restore the remaining portion of the Premises to substantially its condition on the Effective Date and the Rent shall be proportionately and equitably reduced. Notwithstanding the foregoing, Landlord shall not be obligated to expend an amount greater than the proceeds received from the condemning authority for the portion of the Premises affected less all expenses reasonably incurred in connection therewith (including attorneys' fees) for the restoration. All compensation awarded in connection with a Taking shall be the property of Landlord, provided that if allowed under Applicable Law and such does not reduce the award payable to Landlord, Tenant may apply for and keep as its property a separate award for (i) the value of Tenant's leasehold interest; (ii) the value of Tenant's Equipment or other personal property of Tenant; (iii) Tenant's relocation expenses; and (iv) damages to Tenant's business incurred as a result of such Taking.

**12.5    Recording.** If requested by Tenant, Landlord and Tenant agree to execute a Memorandum of Lease that Tenant may record at Tenant's sole cost and expense.

**12.6    Force Majeure.** Notwithstanding anything to the contrary in this Agreement, neither Party shall be liable to the other Party for nonperformance or delay in performance of any of its obligations under this Agreement (other than any obligation of payment) due to causes beyond its reasonable control, including, without limitation, strikes, lockouts, pandemics, acts of God, accidents, governmental restrictions, insurrections, riots, enemy act, war, civil commotion, fire, explosion, flood, windstorm, earthquake, natural disaster or other casualty ("Force Majeure"). Upon the occurrence of a Force Majeure condition, the affected Party shall immediately notify the other Party with as much detail as possible and shall promptly inform the other Party of any further developments. Immediately after the Force Majeure event is removed or abates, the affected Party shall perform such obligations with all due speed. Neither Party shall be deemed in Default or breach of this Agreement to the extent that a delay in performance is due to a Force Majeure event. Notwithstanding the foregoing, in the event of fire or other casualty, the obligation to pay Rent shall equitably abate (based on the resulting decreased usefulness of the Premises to Tenant) starting on the date of destruction or damage and continuing throughout the restoration period, if any, or the date of termination of the Term of this Agreement. If such Force Majeure event prevents the affected Party from performing its obligations under this Agreement, in whole or in material part, for a period of forty-five (45) or more days, then the other Party may terminate the Term of this Agreement immediately upon Notice to the affected Party.

**12.7    Successors and Assigns.** The respective rights and obligations provided in this Agreement shall bind and shall continue to apply for the benefit of the Parties hereto, their legal representative, heirs, successors and permitted assigns. No rights however, shall continue to apply for the benefit of any assignee of Tenant, unless such assignment was made in accordance with Section 12.1 of this Agreement.

**12.8    Governing Law and Construction.** This Agreement shall be construed, governed and enforced in accordance with the laws of the state in which the Premises is located. The section and paragraph headings contained in this Agreement are solely for reference purposes, and shall not affect in any way the meaning or interpretation of this Agreement.

**12.9    Severability.** Each provision of this Agreement shall be construed as separable and divisible from every other provision and the enforceability of any one provision shall not limit the enforceability, in whole or in

part, of any other provision. If a court or administrative body of competent jurisdiction holds any provision of this Agreement to be invalid, illegal, void or less than fully enforceable as to time, scope or otherwise, such provision shall be construed by limiting and reducing it so that such provision is valid, legal and fully enforceable while preserving to the greatest extent permissible the original intent of the Parties; the remaining terms and conditions of this Agreement shall not be affected by such alteration, and shall remain in full force and effect.

12.10    Waiver; Remedies. It is agreed that, except as expressly set forth in this Agreement, the rights and remedies herein provided in case of Default or breach by either Landlord or Tenant are cumulative and shall not affect in any manner any other remedies that the non-breaching Party may have by reason of such Default or breach. The exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided herein, at law, in equity or otherwise. In addition to, and not in limitation of, the preceding, the Parties acknowledge and agree that there will not be an adequate remedy at law for noncompliance with the provisions of Section 5, and therefore either Party shall have the right to seek equitable remedies, including, without limitation, injunctive relief and specific performance.

12.11    Notice. All notices or requests that are required or permitted to be given pursuant to this Agreement must be given in writing by certified US mail (postage pre-paid) with return receipt requested or by courier service (charges prepaid), and if to Landlord also by email, to the Party to be notified, addressed to such Party at the address and email address set forth below, or such other address(es) and email address(es) as such Party may have substituted by written notice (given in accordance with this Section 12.11) to the other Party ("Notice"). The sending of such Notice to the proper email address (in the case of email transmission) or the receipt of such Notice (in the case of delivery by first-class certified mail or by courier service) will constitute the giving thereof.

| If to be given to Landlord: | If to be given to Tenant: |
|---|---|
| CWD 50 Louis, L.L. C. | DISH Wireless L.L.C. |
| Attn: Property Manager | Attn: Lease Administration / DEGRR00145B |
| 50 Louis Street, NW, Suite 600 | 5701 South Santa Fe Drive |
| Grand Rapids, Michigan 49503 | Littleton, Colorado 80120 |
| Email address: sam@cwdrealestate.com | |

12.12    Entire Agreement. This Agreement sets forth the entire, final and complete understanding between the Parties hereto regarding the subject matter of this Agreement, and it supersedes and replaces all previous understandings or agreements, written, oral, or implied, regarding the subject matter of this Agreement made or existing before the date of this Agreement. Except as expressly provided by this Agreement, no waiver or modification of any of the terms or conditions of this Agreement shall be effective unless in writing and signed by both Parties. Any provision of this Agreement that logically would be expected to survive termination or expiration, shall survive, whether or not specifically provided in this Agreement.

12.13    Compliance with Law. Each Party shall, with respect to its actions and/or inactions pursuant to and in connection with this Agreement, comply with all applicable statutes, laws, rules, ordinances, codes and governmental or quasi-governmental orders or regulations (in each case, whether federal, state, local or otherwise) and all amendments thereto, now enacted or hereafter promulgated and in force during the Term of this Agreement.

12.14    Counterparts. This Agreement may be executed in any number of identical counterparts and, if so executed, shall constitute one agreement, binding on all the Parties hereto, notwithstanding that all the Parties are not signatories to the original or the same counterpart. Execution of this Agreement by facsimile or electronic signature shall be effective to create a binding agreement and, if requested, Landlord and Tenant agree to exchange original signed counterparts in their possession.

12.15  Attorneys' Fees. If an action is brought by either Party for breach of any covenant and/or to enforce or interpret any provision of this Agreement, (i) it shall be held in a court with jurisdiction sitting in Kent County, Michigan, (ii) each Party waives trial by jury, and (iii) the prevailing Party shall be entitled to recover its costs, expenses and reasonable attorneys' fees, both at trial and on appeal, in addition to all other sums allowed by law.

12.16  Brokers. The Parties represent and warrant that it has not dealt with any real estate brokers or real estate salespersons in connection with this Agreement, except for CWD Real Estate Investment.  Each Party shall indemnify and hold harmless the other Party from and against any and all Claims resulting from the indemnifying Party's dealings with any real estate broker or real estate salesperson employed or purported to be employed by such indemnifying Party.  Landlord discloses that two indirect owners of Landlord, Scott D. Wierda and Samuel M. Cummings, are licensed Michigan Associate Real Estate Brokers.

12.17.  Incorporation of Exhibits. All exhibits referenced herein and attached hereto are hereby incorporated herein in their entirety by this reference.

*[Remainder of page intentionally left blank. Signature page follows.]*

IN WITNESS WHEREOF, the Parties have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

LANDLORD:

CWD 50 LOUIS, L.L.C.

By: _____

Name: _____

Its: Authorized Agent

Date: _____

TENANT:

DISH WIRELESS L.L.C.

By: _____

Name: _____Richard Leitao_____

Its: _SVP, National Development DISH Wireless_

Date: ___05/16/2023___

12

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

Address: 50 Louis NW, Grand Rapids, Michigan 49503

Parcel ID: 41-13-25-292-005

Legal Description:
Lot 8 and the Northerly 1/2 of Lot 7, Block 12; Also the Northerly 13 feet of the Southerly 1/2 of Lot 7, (Deeded as the Northeasterly 13 feet of the Southwesterly 1/2) of Block 12 of the Plat of the Village (now City) of Grand Rapids commonly called Campau Plat in the City of Grand Rapids, Kent County, Michigan, as recorded in Liber 1 of Plats, Page 81.

## EXHIBIT B

## DEPICTION OF THE PREMISES

See Exhibit C

## EXHIBIT C

### LANDLORD APPROVED TENANT EQUIPMENT

See the attached twenty-nine (29) page Construction Documents prepared by Anine & Associates, Project Number DEGRR0014.5B, last revised October 5, 2022, which remain subject to the approval of the City of Grand Rapids Historical Preservation Commission to be obtained by and at the expense of Tenant.



# d:sh wireless™

DISH Wireless L.L.C. SITE ID:

## DEGRR00145B

DISH Wireless L.L.C. SITE ADDRESS:

## 50 LOUIS ST NW
## GRAND RAPIDS, MI 49503

### MICHIGAN CODE COMPLIANCE

ALL WORK SHALL BE PERFORMED AND MATERIALS INSTALLED IN ACCORDANCE WITH THE CURRENT EDITIONS OF THE FOLLOWING CODES AS ADOPTED BY THE LOCAL GOVERNING AUTHORITIES, NOTHING IN THESE PLANS IS TO BE CONSTRUED TO PERMIT WORK NOT CONFORMING TO THESE CODES:

| CODE TYPE | CODE |
|---|---|
| BUILDING | 2015 MI BUILDING CODE/2015 IBC W/ STATE AMENDMENTS |
| MECHANICAL | 2015 MI MECHANICAL CODE/2015 IMC W/ STATE AMENDMENTS |
| ELECTRICAL | 2017 NEC & MICHIGAN PART 8, ELECTRICAL RULES |

### SHEET INDEX

| SHEET NO. | SHEET TITLE |
|---|---|
| T-1 | TITLE SHEET |
| A-1 | OVERALL SITE PLAN |
| A-2 | ENLARGED BUILDING PLAN |
| A-3 | ANTENNA PLAN AND SCHEDULE |
| A-4 | ANTENNAS ELEVATIONS |
| A-5 | NORTH AND SOUTH ELEVATIONS |
| A-6 | EAST AND WEST ELEVATIONS |
| A-7 | EQUIPMENT DETAILS |
| A-8 | EQUIPMENT DETAILS |
| A-9 | EQUIPMENT DETAILS |
| A-10 | EQUIPMENT DETAILS |
| E-1 | ELECTRICAL/FIBER ROUTE PLAN AND NOTES |
| E-2 | ELECTRICAL DETAILS |
| E-3 | ELECTRICAL ONE-LINE, FAULT CALCS & PANEL SCHEDULE |
| G-1 | GROUNDING PLANS AND NOTES |
| G-2 | GROUNDING DETAILS |
| G-3 | GROUNDING DETAILS |
| RF-1 | RF CABLE COLOR CODE |
| RF-2 | RF PLUMBING DIAGRAM ANTENNA |
| RF-3 | RF PLUMBING DIAGRAM OVP |
| RF-4 | RF PLUMBING DIAGRAM NETWORK |
| RF-5 | RF DATA SHEET |
| S-1, S-2 | STRUCTURAL DETAILS |
| GN-1 | LEGEND AND ABBREVIATIONS |
| GN-2 | GENERAL NOTES |
| GN-3,4,5 | GENERAL NOTES |

---

## AMINE & ASSOCIATES, L.L.C.

200 E. BIG BEAVER ROAD
TROY, MI 48083

### SCOPE OF WORK

THIS IS NOT AN ALL INCLUSIVE LIST. CONTRACTOR SHALL UTILIZE SPECIFIED EQUIPMENT PART OR ENGINEER APPROVED EQUIVALENT. CONTRACTOR SHALL VERIFY ALL NEEDED EQUIPMENT TO PROVIDE A FUNCTIONAL SITE. THE PROJECT GENERALLY CONSISTS OF THE FOLLOWING:

SECTOR SCOPE OF WORK:
- INSTALL (3) PROPOSED PANEL ANTENNAS (1 PER SECTOR)
- INSTALL (1) PROPOSED ANTENNA MOUNTING PIPE ON PENTHOUSE WALL (1 PER GAMMA SECTOR)
- INSTALL (2) PROPOSED ANTENNA NON-PENETRATED TRI-POD (1 PER ALPHA & BETA SECTOR)
- INSTALL PROPOSED JUMPERS
- INSTALL (6) PROPOSED RRUs (2 PER SECTOR)
- INSTALL (3) OVP DEVICE
- INSTALL (3) PROPOSED FIBER AND (3) PROPOSED DC POWER CABLES
- INSTALL PROPOSED ROOFTOP CABLE TRAY & CONDUITS SUPPORTS

ROOFTOP SCOPE OF WORK:
- INSTALL (1) PROPOSED METAL PLATFORM WITH HANDRAIL & ACCESS LADDER
- INSTALL (1) PROPOSED BDU IN CABINET
- INSTALL (1) PROPOSED EQUIPMENT CABINET
- INSTALL (1) PROPOSED PPC
- INSTALL (1) PROPOSED TRANSFORMER AND DISCONNECT SWITCH
- INSTALL (1) PROPOSED POWER CONDUIT
- INSTALL (1) PROPOSED FIBER CONDUIT
- INSTALL (1) PROPOSED NEMA 3 TELCO-FIBER BOX
- INSTALL (1) PROPOSED GPS UNIT

### SITE PHOTO



### UNDERGROUND SERVICE ALERT - MISS DIG
UTILITY NOTIFICATION CENTER OF MICHIGAN
(248) 370-6400
WWW.MISSDIG.ORG

 **811**

CALL 3 BUSINESS DAYS UTILITY BEFORE YOU DIG

### GENERAL NOTES

THE FACILITY IS UNMANNED AND NOT FOR HUMAN HABITATION. A TECHNICIAN WILL VISIT THE SITE AS REQUIRED FOR ROUTINE MAINTENANCE. THE PROJECT WILL NOT RESULT IN ANY SIGNIFICANT DISTURBANCE OR EFFECT ON DRAINAGE. NO SANITARY SEWER SERVICE, POTABLE WATER, OR TRASH DISPOSAL IS REQUIRED AND NO COMMERCIAL SIGNAGE IS PROPOSED.

**11"x17" PLOT WILL BE HALF SCALE UNLESS OTHERWISE NOTED**

CONTRACTOR SHALL VERIFY ALL PLANS, EXISTING DIMENSIONS, AND CONDITIONS ON THE JOB SITE AND SHALL IMMEDIATELY NOTIFY THE ENGINEER IN WRITING OF ANY DISCREPANCIES BEFORE PROCEEDING WITH THE WORK.

---

### SITE INFORMATION

| | |
|---|---|
| PROPERTY OWNER ADDRESS: | N/A |
| STRUCTURE TYPE: | ROOFTOP |
| TOWER CO SITE ID: | N/A |
| TOWER APP NUMBER: | N/A |
| COUNTY: | KENT COUNTY |
| LATITUDE (NAD 83): | 42° 57' 46.8" N 42.963750 |
| LONGITUDE (NAD 83): | 85° 40' 13.5" W -85.670316 |
| ZONING JURISDICTION: | CITY OF GRAND RAPIDS |
| ZONING DISTRICT: | COMMERCIAL |
| PARCEL NUMBER: | 41-13-25-231-005 |
| OCCUPANCY GROUP: | M |
| CONSTRUCTION TYPE: | V-B |
| POWER COMPANY: | TBD |
| FIBER COMPANY: | TBD |

### PROJECT DIRECTORY

| | |
|---|---|
| APPLICANT: | PROPOSED DISH Wireless 5701 SOUTH SANTA FE DRIVE LITTLETON, CO 80120 |
| TOWER OWNER: | N/A |
| SITE DESIGNER: | JOHN M BANKS 804 FOX GLEN BARRINGTON, IL 60010 (847) 377-0070 |
| SITE ACQUISITION: | JONATHAN SZUDMCKI (248) 810-0901 |
| CONSTRUCTION MANAGER: | ROBERT BRITZ (313) 515-1234 |
| RF ENGINEER: | MICHAEL RENCH (248) 245-0370 |

### DIRECTIONS

DIRECTIONS FROM GERALD R. FORD INTERNATIONAL AIRPORT:



### VICINITY MAP



SITE LOCATION

NO SCALE

---



# d:sh wireless™

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

### W WESTCHESTER SERVICES LLC

804 FOX GLEN
BARRINGTON, IL 60010
PHONE 847-277-0070
FAX 847-277-0080
EMAIL:
AEB@westchesterservices.com

**JOHN M. BANKS ARCHITECT**
804 FOX GLEN
BARRINGTON, IL 60010
TELEPHONE 847.277.0070
www.westchesterservices.com

STATE OF MICHIGAN
JOHN M. BANKS
ARCHITECT
No. 40268
LICENSED ARCHITECT

OFFICE 10/17/2023    09/17/2023

IT IS A VIOLATION OF LAW FOR ANY PERSON, UNLESS THEY ARE ACTING UNDER THE DIRECTION OF A LICENSED PROFESSIONAL ENGINEER, TO ALTER THIS DOCUMENT.

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| CC | ST | JAB |

| RFDS REV #: | 1 |
|---|---|



## CONSTRUCTION DOCUMENTS

### SUBMITTALS

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | 10/14/2022 | ISSUED FOR REVIEW |
| 0 | 10/24/2022 | ISSUED FOR PERMIT/CONSTRUCTION |
| 1 | 10/31/2022 | ISSUED FOR PERMIT/CONSTRUCTION |
| 2 | 11/28/2022 | ISSUED FOR PERMIT/CONSTRUCTION |
| 3 | 11/01/2022 | ISSUED FOR PERMIT/CONSTRUCTION |
| 4 | 11/09/2022 | ISSUED FOR PERMIT/CONSTRUCTION |
| 5 | 11/17/2022 | ISSUED FOR PERMIT/CONSTRUCTION |

A&E PROJECT NUMBER
DEGRR00145B

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DEGRR00145B
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
**TITLE SHEET**

SHEET NUMBER
## T-1



OVERALL SITE PLAN



ENLARGED BUILDING PLAN





ANTENNA ELEVATION IN GAMMA SECTOR   1

ANTENNA ELEVATION IN ALPHA & BETA SECTOR   2

CONSTRUCTION DOCUMENTS

ANTENNAS ELEVATIONS

SHEET NUMBER

A-4







PLATFORM EQUIPMENT PLAN

EQUIPMENT PLATFORM ELEVATION

NOTE
1. SEE DRAWING S-1 FOR STRUCTURAL DETAILS

dish
wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

WESTCHESTER
SERVICES LLC

604 FOX GLEN
BARRINGTON, IL 60010
PHONE: 847-277-0070
FAX: 847-277-0080
EMAIL:

JOHN M. BANKS
ARCHITECT

STATE OF MICHIGAN
JOHN M.
BANKS
ARCHITECT
No.
40268
LICENSED ARCHITECT

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| CG | ST | JMB |

RFDS REV #:

CONSTRUCTION
DOCUMENTS

A&E PROJECT NUMBER
DECRR001458

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DECRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
EQUIPMENT PLATFORM AND
H-FRAME DETAILS

SHEET NUMBER

A-7



LEGS NOT USED FOR THIS PROJECT

TRIMMED AS REQUIRED TO FIT NEW
8'x10" EQUIPMENT PLATFORM

DETAIL A

PLATFORM AND HANDRAIL DETAILS

d:sh
wireless.

CONSTRUCTION
DOCUMENTS

EQUIPMENT
DETAILS

A-8



**ENERSYS HEX CABINET 2000005996**

| DIMENSIONS (WxHxD) | 73"x30"x32" |
| WEIGHT (EMPTY) | 376 lbs |
| HEATER | 600W |
| POWER SYSTEM | -48V ALPHA/600A |

CABINET DETAIL — NO SCALE — 1

**SQUARE D SAFETY SWITCH D324NRB**

| ENCLOSURE DIM (WxHxD) | 29.25"x17.25"x8.25" |
| TOTAL WEIGHT (EMPTY) | 43.33 LBS |
| MAX VOLTAGE/AMPS/WATT | 240V/200A/48000W |
| ENCLOSURE RATING | OUTDOOR NEMA 3R |

SAFETY SWITCH — NO SCALE — 2

**GE BREAKER PANEL TLM1220RCUP**

| ENCLOSURE DIM (WxHxD) | 29"x13"x5" |
| TOTAL WEIGHT (EMPTY) | 28 LBS |
| MAX VOLTAGE/MAX AMPS | 240V/200A |
| ENCLOSURE RATING | OUTDOOR NEMA 3R |

BREAKER PANEL DETAIL — NO SCALE — 3

**LEVITON 1N240-21 SUBMETER**

| WATTAGE | 3 |
| AMPS | 200 |
| VOLTS AC | 120, 208, 240 |
| PHASE | 1 |

E-MON D-MON DETAIL — NO SCALE — 4

**ROSENBERGER GPSGLONASS-36-N-S**

| DIMENSIONS (DIA x H) | 69mm x 98.5mm |
| WEIGHT (WITH ACCESSORIES) | 315.74g |
| CONNECTOR | N-FEMALE |
| FREQUENCY RANGE | 1550 MHz ~ 1610.5MHz |

GPS ANTENNA DETAIL — NO SCALE — 5

GPS MINIMUM SKY VIEW REQUIREMENTS — NO SCALE — 6

**DURA-BLOK DB10 ROOFTOP CABLE SUPPORT**

| DIMENSIONS (WxHxL) | 8"x6"x9.8" |
| WEIGHT/ VOLUME | 9.25 LBS |
| ULTIMATE LOAD CAPACITY | 900 LBS |

NOTE: NON-PENETRATING

ROOFTOP CABLE SUPPORT DETAIL — NO SCALE — 7

**COMMSCOPE RT-CB40 ROOFTOP COVER KIT**

| DIMENSIONS (WxHxL) | 7"x 11.25"x 96" |
| WEIGHT/ VOLUME | 65.98 LBS |
| CABLE RUN (QTY) | 4 |

| MOUNTING | NON-PENETRATING |
| INCLUDED PRODUCTS: | RTCB40.01  CHANNEL (1) |
| | MT-F1560  SLEEPERS (3) |
| | RTCLM  HARDWARE |
| | RTHC.01  HOLD-DOWN CLAMPS (4) |

ROOFTOP CABLE TRAY DETAIL — NO SCALE — 8

POST FLASHING DETAIL — NO SCALE — 9

**dish wireless.**

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**WESTCHESTER SERVICES LLC**

604 FOX GLEN
BARRINGTON, IL 60010
PHONE: 847-277-0070
FAX: 847-277-0020
EMAIL:
AE@westchesterservices.com

**JOHN M. BANKS ARCHITECT**
604 FOX GLEN
BARRINGTON, IL 60010
TELEPHONE: 847 277 0070

STATE OF MICHIGAN
JOHN M. BANKS
ARCHITECT
No. CT
40268
LICENSED ARCHITECT

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
| CG | BT | JVD |

RFDS REV #:                    1

**CONSTRUCTION DOCUMENTS**

| SUBMITTALS | | |
| REV | DATE | DESCRIPTION |

A&E PROJECT MANAGER
DEGRR001458

DISH Wireless L.L.C. LLC
PROJECT INFORMATION

DEGRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
**EQUIPMENT DETAILS**

SHEET NUMBER
**A-9**







Case 1:26-cv-01840  ECF No. 2, PageID.106  Filed 06/11/26  Page 42 of 64



PPC ONE-LINE DIAGRAM

TYPICAL PANEL SCHEDULE

PROPOSED ENERSYS PANEL SCHEDULE

NOT USED

NOTES

CONSTRUCTION DOCUMENTS

SHEET TITLE
ELECTRICAL ONE-LINE, FAULT CALCS & PANEL SCHEDULE

SHEET NUMBER
E-3





TYPICAL ANTENNA WALL MOUNTED GROUNDING PLAN — NO SCALE — 4

GROUNDING ELEVATION DETAIL — NO SCALE — 3

EQUIPMENT GROUNDING DETAIL — NO SCALE — 1

TYPICAL ROOFTOP ANTENNA GROUNDING PLAN — NO SCALE — 2

dish
wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

WESTCHESTER
SERVICES LLC

604 FOX GLEN
BARRINGTON, IL 60010
PHONE  847-277-0070
FAX:    847-277-0080
EMAIL

JOHN M. BANKS
ARCHITECT

STATE OF MICHIGAN
JOHN M. BANKS
ARCHITECT
40268
LICENSED ARCHITECT

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| CG | ST | JMB |

RFDS REV #:  1

CONSTRUCTION
DOCUMENTS

| RCV | DATE | DESCRIPTION |
|---|---|---|

ABE PROJECT NUMBER
DEGRR001458

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DEGRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
GROUNDING DETAILS

SHEET NUMBER
G-2



| | | | |
|---|---|---|---|
| TYPICAL GROUNDING NOTES | NO SCALE | 1 | |
| OUTDOOR CABINET GROUNDING | NO SCALE | 2 | |
| TYPICAL CABLE TRAY GROUND BUSS BAR | NO SCALE | 3 | |
| NOT USED | NO SCALE | 4 | |
| TYPICAL EXTERIOR TWO HOLE LUG | NO SCALE | 5 | |
| TYPICAL INTERIOR TWO HOLE LUG | NO SCALE | 6 | |
| LUG DETAIL | NO SCALE | 7 | |
| TYPICAL GPS UNIT GROUNDING | NO SCALE | 8 | |
| NOT USED | NO SCALE | 9 | |

**dish** wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**W WESTCHESTER SERVICES LLC**

JOHN M. BANKS
ARCHITECT

STATE OF MICHIGAN
JOHN M.
BANKS
ARCHITECT
40268
LICENSED ARCHITECT

CONSTRUCTION
DOCUMENTS

A&E PROJECT MANAGER
DECRR001458

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DECRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
GROUNDING DETAILS

SHEET NUMBER
**G-3**



# PLUMBING DIAGRAM ANTENNA

Commscope FFVV-65B-R2

PLUMBING DIAGRAM ANTENNAS

# PLUMBING DIAGRAM OVP



# PLUMBING DIAGRAM NETWORK



# RF EQUIPMENT INFORMATION

**dish** wireless.

| | | |
|---|---|---|
| Issue Date/Revision | 5/2/2023 | Revision  1 |
| Site ID | DEGRR001458 | |
| Site Address | 50 Louis NW, Grand Rapids MI 49503 | |
| Structure Type | Rooftop | |

Latitude  42.963735    Longitude -85.670510
Prequal Asset ID
SOW / RF
Comments

| | Sector 1 (Alpha) | | | Sector 2 (Beta) | | | Sector 3 (Gamma) | | |
|---|---|---|---|---|---|---|---|---|---|
| **ANTENNA** | | | | | | | | | |
| Antenna Mount Position | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 |
| Antenna ID | | 1 | | | 2 | | | 3 | |
| Manufacturer | | Commscope | | | Commscope | | | Commscope | |
| Model Number | | FFVV-65B-R2 | | | FFVV-65B-R2 | | | FFVV-65B-R2 | |
| Dimensions H x W x D (in) | | 72.0" x 19.6" 7.0" | | | 72.0" x 19.6" 7.5" | | | 72.0" x 19.6" 7.5" | |
| Weight (lbs) | | 70.5 | | | 70.5 | | | 70.5 | |
| TX Power Output (watts) | | 40000 | | | 40000 | | | 40000 | |
| ERP (dBw) | | 76.01 | | | 76.01 | | | 76.01 | |
| RAD Center Height (ft) | | 112 | | | 112 | | | 112 | |
| Azimuth (True North) | | 320° | | | 75° | | | 195° | |
| Mech Down Tilt | | 0° | | | 0° | | | 0° | |
| Default Mount | | Generic | | | | | | | |
| **LOW BAND / RADIO #1** | | | | | | | | | |
| Manufacturer | | Fujitsu | | | Fujitsu | | | Fujitsu | |
| Model Number | | TA06023-B605 | | | TA06023-B605 | | | TA06023-B605 | |
| Dimensions H x W x D (in) | | 14.96" x 13.73" x 9.06" | | | 14.96" x 13.73" x 9.06" | | | 14.96" x 13.73" x 9.06" | |
| Weight (lbs) | | 74.95 | | | 74.95 | | | 74.95 | |
| Location | | Cabinet | | | Cabinet | | | Cabinet | |
| Band | | n71 / n29 | | | n71 / n29 | | | n71 / n29 | |
| Quantity | | 1 | | | 1 | | | 1 | |
| Port Assignment | | Port 1-4 | | | Port 1-4 | | | Port 1-4 | |
| Elec Down Tilt | | 7° | | | 5.5° | | | 10° | |
| **MID BAND / RADIO #2** | | | | | | | | | |
| Manufacturer | | Fujitsu | | | Fujitsu | | | Fujitsu | |
| Model Number | | TA06023-B604 | | | TA06023-B604 | | | TA06023-B604 | |
| Dimensions H x W x D (in) | | 14.96" x 13.73" x 7.37" | | | 14.96" x 13.73" x 7.37" | | | 14.96" x 13.73" x 7.37" | |
| Weight (lbs) | | 63.93 | | | 63.93 | | | 63.93 | |
| Location | | Cabinet | | | Cabinet | | | Cabinet | |
| Quantity | | 1 | | | 1 | | | 1 | |
| Band | | n70 / n66 | | | n70 / n66 | | | n70 / n66 | |
| Port Assignment | | Port 5-8 | | | Port 5-8 | | | Port 5-8 | |
| Elec Down Tilt | | 5.5° | | | 8° | | | 5.5° | |
| **OVP (Junction Box)** | | | | | | | | | |
| Manufacturer | | Raycap | | | Raycap | | | Raycap | |
| Model Number | | RDIDC-5035-PF-48 | | | RDIDC-5035-PF-48 | | | RDIDC-5035-PF-48 | |
| Dimensions H x W x D (in) | | 18.35" x 14.96" x 8.46" | | | 18.35" x 14.96" x 8.46" | | | 18.35" x 14.96" x 8.46" | |
| Weight (lbs) | | 21.65 | | | 21.65 | | | 21.65 | |
| Quantity | | 1 | | | 1 | | | 1 | |
| **LINE DETAILS** | | | | | | | | | |
| Line Type | Power | Fiber | | Power | Fiber | | Power | Fiber | |
| Manufacturer | NWS | NWS | | NWS | NWS | | NWS | NWS | |
| Model Number | DC 0/6/0.26 AWG | | | DC 0/6/0.26 AWG | | | DC 0/6/0.26 AWG | | |
| Diameter O.D. (in) | 0.790" | 0.33" | | 0.790" | 0.33" | | 0.918" | 0.33" | |
| Weight (lbs per ft) | .375 lbs/ft | TBD | | .375 lbs/ft | TBD | | .513 lbs/ft | TBD | |
| Quantity | 1 | 1 | | 1 | 1 | | 1 | 1 | |
| Approx. Cable Length | 50 | 50 | | 50 | 50 | | 160 | 160 | |
| **OTHER EQUIPMENT** | | | | | | | | | |
| Type of Equipment | | | | | | | | | |
| Manufacturer | | | | | | | | | |
| Model Number | | | | | | | | | |
| Dimensions H x W x D (in) | | | | | | | | | |
| Weight (lbs) | | | | | | | | | |
| Equipment Location | | | | | | | | | |
| Quantity | | | | | | | | | |

| | Sector 1 | Sector 2 | Sector 3 |
|---|---|---|---|
| Downlink (TX) | 723 - 728 | 2110 - 2200 | 1995 - 2030 / 647 - 652 |
| Uplink (RX) | — | — | 1915 - 1920 / 635 - 632 |

RF DATA SHEET

---

**dish** wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**WESTCHESTER** SERVICES LLC

604 FOX GLEN
BARRINGTON, IL 60010
PHONE 847-277-0070
FAX 847-277-0020

**JOHN M. BANKS ARCHITECT**
434 FOX GLEN
BARRINGTON, IL 60010
TELEPHONE 847 277 2970

STATE OF MICHIGAN
JOHN M.
BANKS
ARCHITECT
No.
40268
LICENSED ARCHITECT
EXPIRES 10/31/2023

| DRAWN BY | CHECKED BY | APPROVED BY |
|---|---|---|
| CD | ST | JMB |

RFDS REV #:   1

**CONSTRUCTION DOCUMENTS**

SUBMITTALS

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | | ISSUED FOR REVIEW |
| 0 | | ISSUED FOR ZONING/CONSTRUCTION |
| 1 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 2 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 3 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 4 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 5 | | ISSUED FOR PERMIT/CONSTRUCTION |

A&E PROJECT NUMBER
DEGRR001458

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DEGRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
RF
DATA SHEET

SHEET NUMBER
**RF-5**

NO SCALE   1



STRUCTURAL DETAILS





LEGEND

ABBREVIATIONS

dish wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

WESTCHESTER SERVICES LLC

JOHN M. BANKS ARCHITECT

JOHN M. BANKS ARCHITECT
No. 40268

CONSTRUCTION DOCUMENTS

A&E PROJECT NUMBER
DEGRR001458

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DEGRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
LEGEND AND ABBREVIATIONS

SHEET NUMBER
GN-1

## SIGN TYPES

| TYPE | COLOR | COLOR CODE PURPOSE |
|---|---|---|
| INFORMATION | GREEN | "INFORMATIONAL SIGN" TO NOTIFY OTHERS OF SITE OWNERSHIP & CONTACT NUMBER AND POTENTIAL RF EXPOSURE. |
| NOTICE | BLUE | "NOTICE BEYOND THIS POINT" RF FIELDS BEYOND THIS POINT MAY EXCEED THE FCC GENERAL PUBLIC EXPOSURE LIMIT. OBEY ALL POSTED SIGNS AND SITE GUIDELINES FOR WORKING IN RF ENVIRONMENTS. IN ACCORDANCE WITH FEDERAL COMMUNICATIONS COMMISSION RULES ON RADIO FREQUENCY EMISSIONS 47 CFR-1.1307(b) |
| CAUTION | YELLOW | "CAUTION BEYOND THIS POINT" RF FIELDS BEYOND THIS POINT MAY EXCEED THE FCC GENERAL PUBLIC EXPOSURE LIMIT. OBEY ALL POSTED SIGNS AND SITE GUIDELINES FOR WORKING IN RF ENVIRONMENTS. IN ACCORDANCE WITH FEDERAL COMMUNICATIONS COMMISSION RULES ON RADIO FREQUENCY EMISSIONS 47 CFR-1.1307(b) |
| WARNING | ORANGE/RED | "WARNING BEYOND THIS POINT" RF FIELDS AT THIS SITE EXCEED FCC RULES FOR HUMAN EXPOSURE. FAILURE TO OBEY ALL POSTED SIGNS AND SITE GUIDELINES FOR WORKING IN RF ENVIRONMENTS COULD RESULT IN SERIOUS INJURY. IN ACCORDANCE WITH FEDERAL COMMUNICATIONS COMMISSION RULES ON RADIO FREQUENCY EMISSIONS 47 CFR-1.1307(b) |

**SIGN PLACEMENT:**

- RF SIGNAGE PLACEMENT SHALL FOLLOW THE RECOMMENDATIONS OF AN EXISTING EME REPORT, CREATED BY A THIRD PARTY PREVIOUSLY AUTHORIZED BY DISH Wireless L.L.C. L.L.C.

- INFORMATION SIGN (GREEN) SHALL BE LOCATED ON EXISTING DISH Wireless L.L.C. L.L.C. EQUIPMENT.
    A) IF THE INFORMATION SIGN IS A STICKER, IT SHALL BE PLACED ON EXISTING DISH Wireless L.L.C. L.L.C. EQUIPMENT CABINET.
    B) IF THE INFORMATION SIGN IS A METAL SIGN IT SHALL BE PLACED ON EXISTING DISH Wireless L.L.C. L.L.C. H-FRAME WITH A SECURE ATTACH METHOD.

- IF EME REPORT IS NOT AVAILABLE AT THE TIME OF CREATION OF CONSTRUCTION DOCUMENTS PLEASE CONTACT DISH Wireless L.L.C. L.L.C. CONSTRUCTION MANAGER FOR FURTHER INSTRUCTION ON HOW TO PROCEED.

**NOTES:**

1. FOR DISH Wireless L.L.C. L.L.C. LOGO, SEE DISH Wireless L.L.C. L.L.C. DESIGN SPECIFICATIONS (PROVIDED BY DISH Wireless L.L.C. L.L.C.)
2. SITE ID SHALL BE APPLIED TO SIGNS USING "LASER ENGRAVING" OR ANY OTHER WEATHER RESISTANT METHOD (DISH Wireless L.L.C. L.L.C. APPROVAL REQUIRED)
3. TEXT FOR SIGNAGE SHALL INDICATE CORRECT SITE NAME AND NUMBER AS PER DISH Wireless L.L.C. L.L.C. CONSTRUCTION MANAGER RECOMMENDATIONS.
4. CABINET/SHELTER MOUNTING APPLICATION REQUIRES ANOTHER PLATE APPLIED TO THE FACE OF THE CABINET WITH WATER PROOF POLYURETHANE ADHESIVE.
5. ALL SIGNS WILL BE SECURED WITH EITHER STAINLESS STEEL ZIP TIES OR STAINLESS STEEL TECH SCREWS
6. ALL SIGNS TO BE 8.5"x11" AND MADE WITH 0.04" OF ALUMINUM MATERIAL.

## INFORMATION

### This is an access point to an area with transmitting antennas.

Obey all signs and barriers beyond this point.
Call the DISH Wireless L.L.C. NOC at 1-866-624-6874

Site ID: _____



THIS SIGN IS FOR REFERENCE PURPOSES ONLY

## NOTICE



Transmitting Antenna(s)

Radio frequency fields beyond this point MAY
*EXCEED* the FCC Occupational exposure limit.

Obey all posted signs and site guidelines for
working in radio frequency environments.

Call the DISH Wireless L.L.C. NOC at 1-866-624-6874
prior to working beyond this point.

Site ID: _____

THIS SIGN IS FOR REFERENCE PURPOSES ONLY

## ⚠ CAUTION



Transmitting Antenna(s)

Radio frequency fields beyond this point MAY
*EXCEED* the FCC Occupational exposure limit.

Obey all posted signs and site guidelines for
working in radio frequency environments.

Call the DISH Wireless L.L.C. NOC at 1-866-624-6874
prior to working beyond this point.

Site ID: _____

THIS SIGN IS FOR REFERENCE PURPOSES ONLY

## ⚠ WARNING



Transmitting Antenna(s)

Radio frequency fields beyond this point
*EXCEED* the FCC Occupational exposure limit.

Obey all posted signs and site guidelines for
working in radio frequency environments.

Call the DISH Wireless L.L.C. NOC at 1-866-624-6874
prior to working beyond this point.

Site ID: _____

THIS SIGN IS FOR REFERENCE PURPOSES ONLY



dish wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**WESTCHESTER** SERVICES, LLC

604 FOX GLEN
BARRINGTON, IL 60010
PHONE: 847-277-0070
FAX: 847-277-0050
EMAIL:
ACE@westchesterservices.com

JOHN M. BANKS
ARCHITECT

JOHN M.
BANKS
ARCHITECT
No.
40268

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| CO | ST | JMB |

| RTDS REV #: | | 1 |

### CONSTRUCTION DOCUMENTS

**SUBMITTALS**

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | | ISSUED FOR REVIEW |
| 0 | | ISSUED FOR FINAL/CONSTRUCTION |
| 1 | | ISSUED FOR FINAL/CONSTRUCTION |
| 2 | | ISSUED FOR FINAL/CONSTRUCTION |
| 3 | | ISSUED FOR FINAL/CONSTRUCTION |
| 4 | | ISSUED FOR FINAL/CONSTRUCTION |
| 5 | | ISSUED FOR FINAL/CONSTRUCTION |

A&E PROJECT NUMBER
DECRRD01458

DISH Wireless L.L.C. L.L.C.
PROJECT INFORMATION

DECRRD01458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
RF SIGNAGE

SHEET NUMBER

**GN-2**

RF SIGNAGE

**SITE ACTIVITY REQUIREMENTS:**

1. NOTICE TO PROCEED — NO WORK SHALL COMMENCE PRIOR TO CONTRACTOR RECEIVING A WRITTEN NOTICE TO PROCEED (NTP) AND THE ISSUANCE OF A PURCHASE ORDER. PRIOR TO ACCESSING/ENTERING THE SITE YOU MUST CONTACT THE PROPOSED DISH Wireless L.L.C. AND TOWER OWNER NOC & THE PROPOSED DISH Wireless L.L.C. AND TOWER OWNER CONSTRUCTION MANAGER.

2. "LOOK UP" — PROPOSED DISH Wireless L.L.C. AND TOWER OWNER SAFETY CLIMB REQUIREMENT: THE INTEGRITY OF THE SAFETY CLIMB AND ALL COMPONENTS OF THE CLIMBING FACILITY SHALL BE CONSIDERED DURING ALL STAGES OF DESIGN, INSTALLATION, AND INSPECTION. TOWER MODIFICATION, MOUNT REINFORCEMENTS, AND/OR EQUIPMENT INSTALLATIONS SHALL NOT COMPROMISE THE INTEGRITY OR FUNCTIONAL USE OF THE SAFETY CLIMB OR ANY COMPONENTS OF THE CLIMBING FACILITY ON THE STRUCTURE. THIS SHALL INCLUDE, BUT NOT BE LIMITED TO; PINCHING OF THE WIRE ROPE, BENDING OF THE WIRE ROPE FROM ITS SUPPORTS, DIRECT CONTACT OR CLOSE PROXIMITY TO THE WIRE ROPE WHICH MAY CAUSE FRICTIONAL WEAR, IMPACT TO THE ANCHORAGE POINTS IN ANY WAY, OR TO IMPEDE/BLOCK ITS INTENDED USE. ANY COMPROMISED SAFETY CLIMB, INCLUDING EXISTING CONDITIONS MUST BE TAGGED OUT AND REPORTED TO YOUR PROPOSED DISH Wireless L.L.C. AND PROPOSED DISH Wireless L.L.C. AND TOWER OWNER POC OR CALL THE NOC TO GENERATE A SAFETY CLIMB MAINTENANCE AND CONTRACTOR NOTICE TICKET.

3. PRIOR TO THE START OF CONSTRUCTION, ALL REQUIRED JURISDICTIONAL PERMITS SHALL BE OBTAINED. THIS INCLUDES, BUT IS NOT LIMITED TO, BUILDING, ELECTRICAL, MECHANICAL, FIRE, FLOOD ZONE, ENVIRONMENTAL, AND ZONING. AFTER ONSITE ACTIVITIES AND CONSTRUCTION ARE COMPLETED, ALL REQUIRED PERMITS SHALL BE SATISFIED AND CLOSED OUT ACCORDING TO LOCAL JURISDICTIONAL REQUIREMENTS.

4. ALL CONSTRUCTION MEANS AND METHODS; INCLUDING BUT NOT LIMITED TO, ERECTION PLANS, RIGGING PLANS, CLIMBING PLANS, AND RESCUE PLANS SHALL BE THE RESPONSIBILITY OF THE GENERAL CONTRACTOR RESPONSIBLE FOR THE EXECUTION OF THE WORK CONTAINED HEREIN, AND SHALL MEET ANSI/ASSE A10.48 (LATEST EDITION); FEDERAL, STATE, AND LOCAL REGULATIONS; AND ANY APPLICABLE INDUSTRY CONSENSUS STANDARDS RELATED TO THE CONSTRUCTION ACTIVITIES BEING PERFORMED. ALL RIGGING PLANS SHALL ADHERE TO ANSI/ASSE A10.48 (LATEST EDITION) AND PROPOSED DISH Wireless L.L.C. AND TOWER OWNER STANDARDS, INCLUDING THE REQUIRED INVOLVEMENT OF A QUALIFIED ENGINEER FOR CLASS IV CONSTRUCTION, TO CERTIFY THE SUPPORTING STRUCTURE(S) IN ACCORDANCE WITH ANSI/TIA-322 (LATEST EDITION).

5. ALL SITE WORK TO COMPLY WITH PROPOSED DISH Wireless L.L.C. AND TOWER OWNER INSTALLATION STANDARDS FOR CONSTRUCTION ACTIVITIES ON PROPOSED DISH Wireless L.L.C. AND TOWER OWNER TOWER SITE AND LATEST VERSION OF ANSI/TIA-1019-A-2012 "STANDARD FOR INSTALLATION, ALTERATION, AND MAINTENANCE OF ANTENNA SUPPORTING STRUCTURES AND ANTENNAS."

6. IF THE SPECIFIED EQUIPMENT CAN NOT BE INSTALLED AS SHOWN ON THESE DRAWINGS, THE CONTRACTOR SHALL PROPOSE AN ALTERNATIVE INSTALLATION FOR APPROVAL BY PROPOSED DISH Wireless L.L.C. AND TOWER OWNER PRIOR TO PROCEEDING WITH ANY SUCH CHANGE OF INSTALLATION.

7. ALL MATERIALS FURNISHED AND INSTALLED SHALL BE IN STRICT ACCORDANCE WITH ALL APPLICABLE CODES, REGULATIONS AND ORDINANCES. CONTRACTOR SHALL ISSUE ALL APPROPRIATE NOTICES AND COMPLY WITH ALL LAWS, ORDINANCES, RULES, REGULATIONS AND LAWFUL ORDERS OF ANY PUBLIC AUTHORITY REGARDING THE PERFORMANCE OF THE WORK. ALL WORK CARRIED OUT SHALL COMPLY WITH ALL APPLICABLE MUNICIPAL AND UTILITY COMPANY SPECIFICATIONS AND LOCAL JURISDICTIONAL CODES, ORDINANCES AND APPLICABLE REGULATIONS.

8. THE CONTRACTOR SHALL INSTALL ALL EQUIPMENT AND MATERIALS IN ACCORDANCE WITH MANUFACTURER'S RECOMMENDATIONS UNLESS SPECIFICALLY STATED OTHERWISE.

9. THE CONTRACTOR SHALL CONTACT UTILITY LOCATING SERVICES INCLUDING PRIVATE LOCATES SERVICES PRIOR TO THE START OF CONSTRUCTION.

10. ALL EXISTING ACTIVE SEWER, WATER, GAS, ELECTRIC AND OTHER UTILITIES WHERE ENCOUNTERED IN THE WORK, SHALL BE PROTECTED AT ALL TIMES AND WHERE REQUIRED FOR THE PROPER EXECUTION OF THE WORK, SHALL BE RELOCATED AS DIRECTED BY CONTRACTOR. EXTREME CAUTION SHOULD BE USED BY THE CONTRACTOR WHEN EXCAVATING OR DRILLING PIERS AROUND OR NEAR UTILITIES. CONTRACTOR SHALL PROVIDE SAFETY TRAINING FOR THE WORKING CREW. THIS WILL INCLUDE BUT NOT BE LIMITED TO A) FALL PROTECTION B) CONFINED SPACE C) ELECTRICAL SAFETY D) TRENCHING AND EXCAVATION E) CONSTRUCTION SAFETY PROCEDURES.

11. ALL SITE WORK SHALL BE AS INDICATED ON THE STAMPED CONSTRUCTION DRAWINGS AND DISH PROJECT SPECIFICATIONS, LATEST APPROVED REVISION.

12. CONTRACTOR SHALL KEEP THE SITE FREE FROM ACCUMULATING WASTE MATERIAL, DEBRIS, AND TRASH AT THE COMPLETION OF THE WORK. IF NECESSARY, RUBBISH, STUMPS, DEBRIS, STICKS, STONES AND OTHER REFUSE SHALL BE REMOVED FROM THE SITE AND DISPOSED OF LEGALLY.

13. ALL EXISTING INACTIVE SEWER, WATER, GAS, ELECTRIC AND OTHER UTILITIES, WHICH INTERFERE WITH THE EXECUTION OF THE WORK, SHALL BE REMOVED AND/OR CAPPED, PLUGGED OR OTHERWISE DISCONTINUED AT POINTS WHICH WILL NOT INTERFERE WITH THE EXECUTION OF THE WORK, SUBJECT TO THE APPROVAL OF PROPOSED DISH Wireless L.L.C. AND TOWER OWNER, AND/OR LOCAL UTILITIES.

14. THE CONTRACTOR SHALL PROVIDE SITE SIGNAGE IN ACCORDANCE WITH THE TECHNICAL SPECIFICATION FOR SITE SIGNAGE REQUIRED BY LOCAL JURISDICTION AND SIGNAGE REQUIRED ON INDIVIDUAL PIECES OF EQUIPMENT, ROOMS, AND SHELTERS.

15. THE SITE SHALL BE GRADED TO CAUSE SURFACE WATER TO FLOW AWAY FROM THE CARRIER'S EQUIPMENT AND TOWER AREAS.

16. THE SUB GRADE SHALL BE COMPACTED AND BROUGHT TO A SMOOTH UNIFORM GRADE PRIOR TO FINISHED SURFACE APPLICATION.

17. THE AREAS OF THE OWNERS PROPERTY DISTURBED BY THE WORK AND NOT COVERED BY THE TOWER, EQUIPMENT OR DRIVEWAY, SHALL BE GRADED TO A UNIFORM SLOPE, AND STABILIZED TO PREVENT EROSION AS SPECIFIED ON THE CONSTRUCTION DRAWINGS AND/OR PROJECT SPECIFICATIONS.

18. CONTRACTOR SHALL MINIMIZE DISTURBANCE TO EXISTING SITE DURING CONSTRUCTION. EROSION CONTROL MEASURES, IF REQUIRED DURING CONSTRUCTION, SHALL BE IN CONFORMANCE WITH THE LOCAL GUIDELINES FOR EROSION AND SEDIMENT CONTROL.

19. THE CONTRACTOR SHALL PROTECT EXISTING IMPROVEMENTS, PAVEMENTS, CURBS, LANDSCAPING AND STRUCTURES. ANY DAMAGED PART SHALL BE REPAIRED AT CONTRACTOR'S EXPENSE TO THE SATISFACTION OF OWNER.

20. CONTRACTOR SHALL LEGALLY AND PROPERLY DISPOSE OF ALL SCRAP MATERIALS SUCH AS COAXIAL CABLES AND OTHER ITEMS REMOVED FROM THE EXISTING FACILITY. ANTENNAS AND RADIOS REMOVED SHALL BE RETURNED TO THE OWNER'S DESIGNATED LOCATION.

21. CONTRACTOR SHALL LEAVE PREMISES IN CLEAN CONDITION. TRASH AND DEBRIS SHOULD BE REMOVED FROM SITE ON A DAILY BASIS.

22. NO FILL OR EMBANKMENT MATERIAL SHALL BE PLACED ON FROZEN GROUND. FROZEN MATERIALS, SNOW OR ICE SHALL NOT BE PLACED IN ANY FILL OR EMBANKMENT.

**GENERAL NOTES:**

1. FOR THE PURPOSE OF CONSTRUCTION DRAWING, THE FOLLOWING DEFINITIONS SHALL APPLY:

CONTRACTOR:GENERAL CONTRACTOR RESPONSIBLE FOR CONSTRUCTION

CARRIER:PROPOSED DISH Wireless L.L.C.

TOWER OWNER:TOWER OWNER

2. THESE DRAWINGS HAVE BEEN PREPARED USING STANDARDS OF PROFESSIONAL CARE AND COMPLETENESS NORMALLY EXERCISED UNDER SIMILAR CIRCUMSTANCES BY REPUTABLE ENGINEERS IN THIS OR SIMILAR LOCALITIES. IT IS ASSUMED THAT THE WORK DEPICTED WILL BE PERFORMED BY AN EXPERIENCED CONTRACTOR AND/OR WORKPEOPLE WHO HAVE A WORKING KNOWLEDGE OF THE APPLICABLE CODE STANDARDS AND REQUIREMENTS AND OF INDUSTRY ACCEPTED STANDARD GOOD PRACTICE. AS NOT EVERY CONDITION OR ELEMENT IS (OR CAN BE) EXPLICITLY SHOWN ON THESE DRAWINGS, THE CONTRACTOR SHALL USE INDUSTRY ACCEPTED STANDARD GOOD PRACTICE FOR MISCELLANEOUS WORK NOT EXPLICITLY SHOWN.

3. THESE DRAWINGS REPRESENT THE FINISHED STRUCTURE. THEY DO NOT INDICATE THE MEANS OR METHODS OF CONSTRUCTION. THE CONTRACTOR SHALL BE SOLELY RESPONSIBLE FOR THE CONSTRUCTION MEANS, METHODS, TECHNIQUES, SEQUENCES, AND PROCEDURES. THE CONTRACTOR SHALL PROVIDE ALL MEASURES NECESSARY FOR PROTECTION OF LIFE AND PROPERTY DURING CONSTRUCTION. SUCH MEASURES SHALL INCLUDE, BUT NOT BE LIMITED TO, BRACING, FORMWORK, SHORING, ETC. SITE VISITS BY THE ENGINEER OR HIS REPRESENTATIVE WILL NOT INCLUDE INSPECTION OF THESE ITEMS AND IS FOR STRUCTURAL OBSERVATION OF THE FINISHED STRUCTURE ONLY.

4. NOTES AND DETAILS IN THE CONSTRUCTION DRAWINGS SHALL TAKE PRECEDENCE OVER GENERAL NOTES AND TYPICAL DETAILS. WHERE NO DETAILS ARE SHOWN, CONSTRUCTION SHALL CONFORM TO SIMILAR WORK ON THE PROJECT, AND/OR AS PROVIDED FOR IN THE CONTRACT DOCUMENTS. WHERE DISCREPANCIES OCCUR BETWEEN PLANS, DETAILS, GENERAL NOTES, AND SPECIFICATIONS, THE GREATER, MORE STRICT REQUIREMENTS, SHALL GOVERN. IF FURTHER CLARIFICATION IS REQUIRED CONTACT THE ENGINEER OF RECORD.

5. SUBSTANTIAL EFFORT HAS BEEN MADE TO PROVIDE ACCURATE DIMENSIONS AND MEASUREMENTS ON THE DRAWINGS TO ASSIST IN THE FABRICATION AND/OR PLACEMENT OF CONSTRUCTION ELEMENTS BUT IT IS THE SOLE RESPONSIBILITY OF THE CONTRACTOR TO FIELD VERIFY THE DIMENSIONS, MEASUREMENTS, AND/OR CLEARANCES SHOWN IN THE CONSTRUCTION DRAWINGS PRIOR TO FABRICATION OR CUTTING OF ANY NEW OR EXISTING CONSTRUCTION ELEMENTS. IF IT IS DETERMINED THAT THERE ARE DISCREPANCIES AND/OR CONFLICTS WITH THE CONSTRUCTION DRAWINGS THE ENGINEER OF RECORD IS TO BE NOTIFIED AS SOON AS POSSIBLE.

6. PRIOR TO THE SUBMISSION OF BIDS, THE BIDDING CONTRACTOR SHALL VISIT THE CELL SITE TO FAMILIARIZE WITH THE EXISTING CONDITIONS AND TO CONFIRM THAT THE WORK CAN BE ACCOMPLISHED AS SHOWN ON THE CONSTRUCTION DRAWINGS. ANY DISCREPANCY FOUND SHALL BE BROUGHT TO THE ATTENTION OF CARRIER POC AND TOWER OWNER.

7. ALL MATERIALS FURNISHED AND INSTALLED SHALL BE IN STRICT ACCORDANCE WITH ALL APPLICABLE CODES, REGULATIONS AND ORDINANCES. CONTRACTOR SHALL ISSUE ALL APPROPRIATE NOTICES AND COMPLY WITH ALL LAWS, ORDINANCES, RULES, REGULATIONS AND LAWFUL ORDERS OF ANY PUBLIC AUTHORITY REGARDING THE PERFORMANCE OF THE WORK. ALL WORK CARRIED OUT SHALL COMPLY WITH ALL APPLICABLE MUNICIPAL AND UTILITY COMPANY SPECIFICATIONS AND LOCAL JURISDICTIONAL CODES, ORDINANCES AND APPLICABLE REGULATIONS.

8. UNLESS NOTED OTHERWISE, THE WORK SHALL INCLUDE FURNISHING MATERIALS, EQUIPMENT, APPURTENANCES AND LABOR NECESSARY TO COMPLETE ALL INSTALLATIONS AS SHOWN ON THE DRAWINGS.

9. THE CONTRACTOR SHALL INSTALL ALL EQUIPMENT AND MATERIALS IN ACCORDANCE WITH MANUFACTURER'S RECOMMENDATIONS UNLESS SPECIFICALLY STATED OTHERWISE.

10. IF THE SPECIFIED EQUIPMENT CAN NOT BE INSTALLED AS SHOWN ON THESE DRAWINGS, THE CONTRACTOR SHALL PROPOSE AN ALTERNATIVE INSTALLATION FOR APPROVAL BY THE CARRIER AND TOWER OWNER PRIOR TO PROCEEDING WITH ANY SUCH CHANGE OF INSTALLATION.

11. CONTRACTOR IS TO PERFORM A SITE INVESTIGATION, BEFORE SUBMITTING BIDS, TO DETERMINE THE BEST ROUTING OF ALL CONDUITS FOR POWER, AND TELCO AND FOR GROUNDING CABLES AS SHOWN IN THE POWER, TELCO, AND GROUNDING PLAN DRAWINGS.

12. THE CONTRACTOR SHALL PROTECT EXISTING IMPROVEMENTS, PAVEMENTS, CURBS, LANDSCAPING AND STRUCTURES. ANY DAMAGED PART SHALL BE REPAIRED AT CONTRACTOR'S EXPENSE TO THE SATISFACTION OF PROPOSED DISH Wireless L.L.C. AND TOWER OWNER.

13. CONTRACTOR SHALL LEGALLY AND PROPERLY DISPOSE OF ALL SCRAP MATERIALS SUCH AS COAXIAL CABLES AND OTHER ITEMS REMOVED FROM THE EXISTING FACILITY. ANTENNAS REMOVED SHALL BE RETURNED TO THE OWNER'S DESIGNATED LOCATION.

14. CONTRACTOR SHALL LEAVE PREMISES IN CLEAN CONDITION. TRASH AND DEBRIS SHOULD BE REMOVED FROM SITE ON A DAILY BASIS.



**dish wireless.**

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**WESTCHESTER SERVICES LLC**

804 FOX GLEN
BARRINGTON, IL 60010

**JOHN M. BANKS ARCHITECT**

STATE OF MICHIGAN
JOHN M. BANKS
ARCHITECT
40268
LICENSED ARCHITECT

| DRAWN BY: | CHECKED BY: | APPROVED BY |
|---|---|---|
| CG | BT | JMB |

RFDS REV #: 1

**CONSTRUCTION DOCUMENTS**

SUBMITTALS

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | | ISSUED FOR REVIEW |
| 0 | | ISSUED FOR PRELIM/CONSTRUCTION |
| 1 | | ISSUED FOR PRELIM/CONSTRUCTION |
| 2 | | ISSUED FOR PRELIM/CONSTRUCTION |
| 3 | | ISSUED FOR PRELIM/CONSTRUCTION |
| 4 | | ISSUED FOR PRELIM/CONSTRUCTION |
| 5 | | ISSUED FOR PRELIM/CONSTRUCTION |

A&E PROJECT NUMBER
DECRR001458

DISH Wireless L.L.C. LLC.
PROJECT INFORMATION

DECRR001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
GENERAL NOTES

SHEET NUMBER
**GN-3**

**CONCRETE, FOUNDATIONS, AND REINFORCING STEEL:**

1. ALL CONCRETE WORK SHALL BE IN ACCORDANCE WITH THE ACI 301, ACI 318, ACI 336, ASTM A184, ASTM A185 AND THE DESIGN AND CONSTRUCTION SPECIFICATION FOR CAST-IN-PLACE CONCRETE.

2. UNLESS NOTED OTHERWISE, SOIL BEARING PRESSURE USED FOR DESIGN OF SLABS AND FOUNDATIONS IS ASSUMED TO BE 1000 psf.

3. ALL CONCRETE SHALL HAVE A MINIMUM COMPRESSIVE STRENGTH (f'c) OF 3000 psi AT 28 DAYS, UNLESS NOTED OTHERWISE. NO MORE THAN 90 MINUTES SHALL ELAPSE FROM BATCH TIME TO TIME OF PLACEMENT UNLESS APPROVED BY THE ENGINEER OF RECORD, TEMPERATURE OF CONCRETE SHALL NOT EXCEED 90°F AT TIME OF PLACEMENT.

4. CONCRETE EXPOSED TO FREEZE-THAW CYCLES SHALL CONTAIN AIR ENTRAINING ADMIXTURES. AMOUNT OF AIR ENTRAINMENT TO BE BASED ON SIZE OF AGGREGATE AND F3 CLASS EXPOSURE (VERY SEVERE). CEMENT USED TO BE TYPE II PORTLAND CEMENT WITH A MAXIMUM WATER-TO-CEMENT RATIO (W/C) OF 0.45.

5. ALL STEEL REINFORCING SHALL CONFORM TO ASTM A615. ALL WELDED WIRE FABRIC (WWF) SHALL CONFORM TO ASTM A185. ALL SPLICES SHALL BE CLASS "B" TENSION SPLICES, UNLESS NOTED OTHERWISE. ALL HOOKS SHALL BE STANDARD 90 DEGREE HOOKS, UNLESS NOTED OTHERWISE. YIELD STRENGTH (Fy) OF STANDARD DEFORMED BARS ARE AS FOLLOWS:

#4 BARS AND SMALLER 40 ksi

#5 BARS AND LARGER 60 ksi

6. THE FOLLOWING MINIMUM CONCRETE COVER SHALL BE PROVIDED FOR REINFORCING STEEL UNLESS SHOWN OTHERWISE ON DRAWINGS:

- CONCRETE CAST AGAINST AND PERMANENTLY EXPOSED TO EARTH 3"
- CONCRETE EXPOSED TO EARTH OR WEATHER:
  - #6 BARS AND LARGER 2"
  - #5 BARS AND SMALLER 1-1/2"
- CONCRETE NOT EXPOSED TO EARTH OR WEATHER:
  - SLAB AND WALLS 3/4"
  - BEAMS AND COLUMNS 1-1/2"

7. A TOOLED EDGE OR A 3/4" CHAMFER SHALL BE PROVIDED AT ALL EXPOSED EDGES OF CONCRETE, UNLESS NOTED OTHERWISE, IN ACCORDANCE WITH ACI 301 SECTION 4.2.4.

**ELECTRICAL INSTALLATION NOTES:**

1. ALL ELECTRICAL WORK SHALL BE PERFORMED IN ACCORDANCE WITH THE PROJECT SPECIFICATIONS, NEC AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL CODES/ORDINANCES.

2. CONDUIT ROUTINGS ARE SCHEMATIC. CONTRACTOR SHALL INSTALL CONDUITS SO THAT ACCESS TO EQUIPMENT IS NOT BLOCKED AND TRIP HAZARDS ARE ELIMINATED.

3. WIRING, RACEWAY AND SUPPORT METHODS AND MATERIALS SHALL COMPLY WITH THE REQUIREMENTS OF THE NEC.

4. ALL CIRCUITS SHALL BE SEGREGATED AND MAINTAIN MINIMUM CABLE SEPARATION AS REQUIRED BY THE NEC.

4.1. ALL EQUIPMENT SHALL BEAR THE UNDERWRITERS LABORATORIES LABEL OF APPROVAL, AND SHALL CONFORM TO REQUIREMENT OF THE NATIONAL ELECTRICAL CODE.

4.2. ALL OVERCURRENT DEVICES SHALL HAVE AN INTERRUPTING CURRENT RATING THAT SHALL BE GREATER THAN THE SHORT CIRCUIT CURRENT TO WHICH THEY ARE SUBJECTED. 22,000 AIC MINIMUM. VERIFY AVAILABLE SHORT CIRCUIT CURRENT DOES NOT EXCEED THE RATING OF ELECTRICAL EQUIPMENT IN ACCORDANCE WITH ARTICLE 110.24 NEC OR THE MOST CURRENT ADOPTED CODE PER THE GOVERNING JURISDICTION.

5. EACH END OF EVERY POWER PHASE CONDUCTOR, GROUNDING CONDUCTOR, AND TELCO CONDUCTOR OR CABLE SHALL BE LABELED WITH COLOR-CODED INSULATION OR ELECTRICAL TAPE (3M BRAND, 1/2" PLASTIC ELECTRICAL TAPE WITH UV PROTECTION, OR EQUAL). THE IDENTIFICATION METHOD SHALL CONFORM WITH NEC AND OSHA.

6. ALL ELECTRICAL COMPONENTS SHALL BE CLEARLY LABELED WITH LAMICOID TAGS SHOWING THEIR RATED VOLTAGE, PHASE CONFIGURATION, WIRE CONFIGURATION, POWER OR AMPACITY RATING AND BRANCH CIRCUIT ID NUMBERS (i.e. PANEL BOARD AND CIRCUIT ID'S).

7. PANEL BOARDS (ID NUMBERS) SHALL BE CLEARLY LABELED WITH PLASTIC LABELS.

8. TIE WRAPS ARE NOT ALLOWED.

9. ALL POWER AND EQUIPMENT GROUND WIRING IN TUBING OR CONDUIT SHALL BE SINGLE COPPER CONDUCTOR (#14 OR LARGER) WITH TYPE THHN, THWN, THWN-2, XHHW, XHHW-2, THW, THW-2, RHW, OR RHW-2 INSULATION UNLESS OTHERWISE SPECIFIED.

10. SUPPLEMENTAL EQUIPMENT GROUND WIRING LOCATED INDOORS SHALL BE SINGLE COPPER CONDUCTOR (#6 OR LARGER) WITH TYPE THHN, THWN, THWN-2, XHHW, XHHW-2, THW, THW-2, RHW, OR RHW-2 INSULATION UNLESS OTHERWISE SPECIFIED.

11. POWER AND CONTROL WIRING IN FLEXIBLE CORD SHALL BE MULTI-CONDUCTOR, TYPE SOOW CORD (#14 OR LARGER) UNLESS OTHERWISE SPECIFIED.

12. POWER AND CONTROL WIRING FOR USE IN CABLE TRAY SHALL BE MULTI-CONDUCTOR, TYPE TC CABLE (#14 OR LARGER), WITH TYPE THHN, THWN, THWN-2, XHHW, XHHW-2, THW, THW-2, RHW, OR RHW-2 INSULATION UNLESS OTHERWISE SPECIFIED.

13. ALL POWER AND GROUNDING CONNECTIONS SHALL BE CRIMP-STYLE, COMPRESSION WIRE LUGS AND WIRE NUTS BY THOMAS AND BETTS (OR EQUAL). LUGS AND WIRE NUTS SHALL BE RATED FOR OPERATION NOT LESS THAN 75°C (90°C IF AVAILABLE).

14. RACEWAY AND CABLE TRAY SHALL BE LISTED OR LABELED FOR ELECTRICAL USE IN ACCORDANCE WITH NEMA, UL, ANSI/IEEE AND NEC.

15. ELECTRICAL METALLIC TUBING (EMT), INTERMEDIATE METAL CONDUIT (IMC), OR RIGID METAL CONDUIT (RMC) SHALL BE USED FOR EXPOSED INDOOR LOCATIONS.

16. ELECTRICAL METALLIC TUBING (EMT) OR METAL-CLAD CABLE (MC) SHALL BE USED FOR CONCEALED INDOOR LOCATIONS.

17. SCHEDULE 40 PVC UNDERGROUND ON STRAIGHTS AND SCHEDULE 80 PVC FOR ALL ELBOWS/90s AND ALL APPROVED ABOVE GRADE PVC CONDUIT.

18. LIQUID-TIGHT FLEXIBLE METALLIC CONDUIT (LIQUID-TITE FLEX) SHALL BE USED INDOORS AND OUTDOORS, WHERE VIBRATION OCCURS OR FLEXIBILITY IS NEEDED.

19. CONDUIT AND TUBING FITTINGS SHALL BE THREADED OR COMPRESSION-TYPE AND APPROVED FOR THE LOCATION USED. SET SCREW FITTINGS ARE NOT ACCEPTABLE.

20. CABINETS, BOXES AND WIRE WAYS SHALL BE LABELED FOR ELECTRICAL USE IN ACCORDANCE WITH NEMA, UL, ANSI/IEEE AND THE NEC.

21. WIREWAYS SHALL BE METAL WITH AN ENAMEL FINISH AND INCLUDE A HINGED COVER, DESIGNED TO SWING OPEN DOWNWARDS (WIREMOLD SPECMATE WIREWAY).

22. SLOTTED WIRING DUCT SHALL BE PVC AND INCLUDE COVER (PANDUIT TYPE E OR EQUAL).

23. CONDUITS SHALL BE FASTENED SECURELY IN PLACE WITH APPROVED NON-PERFORATED STRAPS AND HANGERS. EXPLOSIVE DEVICES (i.e. POWDER-ACTUATED) FOR ATTACHING HANGERS TO STRUCTURE WILL NOT BE PERMITTED. CLOSELY FOLLOW THE LINES OF THE STRUCTURE, MAINTAIN CLOSE PROXIMITY TO THE STRUCTURE AND KEEP CONDUITS IN TIGHT ENVELOPES. CHANGES IN DIRECTION TO ROUTE AROUND OBSTACLES SHALL BE MADE WITH CONDUIT OUTLET BODIES. CONDUIT SHALL BE INSTALLED IN A NEAT AND WORKMANLIKE MANNER, PARALLEL AND PERPENDICULAR TO STRUCTURE WALL AND CEILING LINES. ALL CONDUIT SHALL BE FISHED TO CLEAR OBSTRUCTIONS. ENDS OF CONDUITS SHALL BE TEMPORARILY CAPPED FLUSH TO FINISH GRADE TO PREVENT CONCRETE, PLASTER OR DIRT FROM ENTERING. CONDUITS SHALL BE RIGIDLY CLAMPED TO BOXES BY GALVANIZED MALLEABLE IRON BUSHING ON INSIDE AND GALVANIZED MALLEABLE IRON LOCKNUT ON OUTSIDE AND INSIDE.

24. EQUIPMENT CABINETS, TERMINAL BOXES, JUNCTION BOXES AND PULL BOXES SHALL BE GALVANIZED OR EPOXY-COATED SHEET STEEL. SHALL MEET OR EXCEED UL 50 AND BE RATED NEMA 1 (OR BETTER) FOR INTERIOR LOCATIONS AND NEMA 3 (OR BETTER) FOR EXTERIOR LOCATIONS.

25. METAL RECEPTACLE, SWITCH AND DEVICE BOXES SHALL BE GALVANIZED, EPOXY-COATED OR NON-CORRODING; SHALL MEET OR EXCEED UL 514A AND NEMA OS 1 AND BE RATED NEMA 1 (OR BETTER) FOR INTERIOR LOCATIONS AND WEATHER PROTECTED (WP OR BETTER) FOR EXTERIOR LOCATIONS.

26. NONMETALLIC RECEPTACLE, SWITCH AND DEVICE BOXES SHALL MEET OR EXCEED NEMA OS 2 (NEWEST REVISION) AND BE RATED NEMA 1 (OR BETTER) FOR INTERIOR LOCATIONS AND WEATHER PROTECTED (WP OR BETTER) FOR EXTERIOR LOCATIONS.

27. THE CONTRACTOR SHALL NOTIFY AND OBTAIN NECESSARY AUTHORIZATION FROM THE CARRIER AND/OR PROPOSED DISH Wireless L.L.C. AND TOWER OWNER BEFORE COMMENCING WORK ON THE AC POWER DISTRIBUTION PANELS.

28. THE CONTRACTOR SHALL PROVIDE NECESSARY TAGGING ON THE BREAKERS, CABLES AND DISTRIBUTION PANELS IN ACCORDANCE WITH THE APPLICABLE CODES AND STANDARDS TO SAFEGUARD LIFE AND PROPERTY.

29. INSTALL LAMICOID LABEL ON THE METER CENTER TO SHOW "PROPOSED DISH Wireless L.L.C.".

30. ALL EMPTY/SPARE CONDUITS THAT ARE INSTALLED ARE TO HAVE A METERED MULE TAPE PULL CORD INSTALLED.



dish wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120



WESTCHESTER
SERVICES LLC

JOHN M. BANKS
ARCHITECT

STATE OF MICHIGAN
JOHN M.
BANKS
ARCHITECT
No.
40268
LICENSED ARCHITECT

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| CG | ST | JMB |

RFDS REV #:

**CONSTRUCTION DOCUMENTS**

SUBMITTALS

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | | ISSUED FOR REVIEW |
| 0 | | ISSUED FOR CONSTRUCTION |
| 1 | | ISSUED FOR CONSTRUCTION |
| 2 | | ISSUED FOR CONSTRUCTION |
| 3 | | ISSUED FOR CONSTRUCTION |
| 4 | | ISSUED FOR CONSTRUCTION |
| 5 | | ISSUED FOR CONSTRUCTION |

A&E PROJECT NUMBER

DEGRR001459

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DEGRR001459
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE

GENERAL NOTES

SHEET NUMBER

**GN-4**

GROUNDING NOTES:

1. ALL GROUND ELECTRODE SYSTEMS (INCLUDING TELECOMMUNICATION, RADIO, LIGHTNING PROTECTION AND AC POWER CES'S) SHALL BE BONDED TOGETHER AT OR BELOW GRADE, BY TWO OR MORE COPPER BONDING CONDUCTORS IN ACCORDANCE WITH THE NEC.

2. THE CONTRACTOR SHALL PERFORM IEEE FALL-OF-POTENTIAL RESISTANCE TO EARTH TESTING (PER IEEE 1100 AND 81) FOR GROUND ELECTRODE SYSTEMS, THE CONTRACTOR SHALL FURNISH AND INSTALL SUPPLEMENTAL GROUND ELECTRODES AS NEEDED TO ACHIEVE A TEST RESULT OF 5 OHMS OR LESS.

3. THE CONTRACTOR IS RESPONSIBLE FOR PROPERLY SEQUENCING GROUNDING AND UNDERGROUND CONDUIT INSTALLATION AS TO PREVENT ANY LOSS OF CONTINUITY IN THE GROUNDING SYSTEM OR DAMAGE TO THE CONDUIT AND PROVIDE TESTING RESULTS.

4. METAL CONDUIT AND TRAY SHALL BE GROUNDED AND MADE ELECTRICALLY CONTINUOUS WITH LISTED BONDING FITTINGS OR BY BONDING ACROSS THE DISCONTINUITY WITH #6 COPPER WIRE UL APPROVED GROUNDING TYPE CONDUIT CLAMPS.

5. METAL RACEWAY SHALL NOT BE USED AS THE NEC REQUIRED EQUIPMENT GROUND CONDUCTOR. STRANDED COPPER CONDUCTORS WITH GREEN INSULATION, SIZED IN ACCORDANCE WITH THE NEC, SHALL BE FURNISHED AND INSTALLED WITH THE POWER CIRCUITS TO ITS EQUIPMENT.

6. EACH CABINET FRAME SHALL BE DIRECTLY CONNECTED TO THE MASTER GROUND BAR WITH GREEN INSULATED SUPPLEMENTAL EQUIPMENT GROUND WIRES, #6 STRANDED COPPER OR LARGER FOR INDOOR BTS; #2 BARE SOLID TINNED COPPER FOR OUTDOOR BTS.

7. CONNECTIONS TO THE GROUND BUS SHALL NOT BE DOUBLED UP OR STACKED BACK TO BACK CONNECTIONS ON OPPOSITE SIDE OF THE GROUND BUS ARE PERMITTED.

8. ALL EXTERIOR GROUND CONDUCTORS BETWEEN EQUIPMENT/GROUND BARS AND THE GROUND RING SHALL BE #2 SOLID TINNED COPPER UNLESS OTHERWISE INDICATED.

9. ALUMINUM CONDUCTOR OR COPPER CLAD STEEL CONDUCTOR SHALL NOT BE USED FOR GROUNDING CONNECTIONS.

10. USE OF 90° BENDS IN THE PROTECTION GROUNDING CONDUCTORS SHALL BE AVOIDED WHEN 45° BENDS CAN BE ADEQUATELY SUPPORTED.

11. EXOTHERMIC WELDS SHALL BE USED FOR ALL GROUNDING CONNECTIONS BELOW GRADE.

12. ALL GROUND CONNECTIONS ABOVE GRADE (INTERIOR AND EXTERIOR) SHALL BE FORMED USING HIGH PRESS CRIMPS.

13. COMPRESSION GROUND CONNECTIONS MAY BE REPLACED BY EXOTHERMIC WELD CONNECTIONS.

14. ICE BRIDGE BONDING CONDUCTORS SHALL BE EXOTHERMICALLY BONDED OR BOLTED TO THE BRIDGE AND THE TOWER GROUND BAR.

15. APPROVED ANTIOXIDANT COATINGS (i.e. CONDUCTIVE GEL OR PASTE) SHALL BE USED ON ALL COMPRESSION AND BOLTED GROUND CONNECTIONS.

16. ALL EXTERIOR GROUND CONNECTIONS SHALL BE COATED WITH A CORROSION RESISTANT MATERIAL.

17. MISCELLANEOUS ELECTRICAL AND NON-ELECTRICAL METAL BOXES, FRAMES AND SUPPORTS SHALL BE BONDED TO THE GROUND RING, IN ACCORDANCE WITH THE NEC.

18. BOND ALL METALLIC OBJECTS WITHIN 6 FT OF MAIN GROUND RING WITH (1) #2 BARE SOLID TINNED COPPER GROUND CONDUCTOR.

19. GROUND CONDUCTORS USED FOR THE FACILITY GROUNDING AND LIGHTNING PROTECTION SYSTEMS SHALL NOT BE ROUTED THROUGH METALLIC OBJECTS THAT FORM A RING AROUND THE CONDUCTOR, SUCH AS METALLIC CONDUITS, METAL SUPPORT CLIPS OR SLEEVES THROUGH WALLS OR FLOORS. WHEN IT IS REQUIRED TO BE HOUSED IN CONDUIT TO MEET CODE REQUIREMENTS OR LOCAL CONDITIONS, NON-METALLIC MATERIAL SUCH AS PVC CONDUIT SHALL BE USED. WHERE USE OF METAL CONDUIT IS UNAVOIDABLE (i.e., NONMETALLIC CONDUIT PROHIBITED BY LOCAL CODE) THE GROUND CONDUCTOR SHALL BE BONDED TO EACH END OF THE METAL CONDUIT.

20. ALL GROUNDS THAT TRANSITION FROM BELOW GRADE TO ABOVE GRADE MUST BE #2 BARE SOLID TINNED COPPER IN 3/4" NON-METALLIC, FLEXIBLE CONDUIT FROM 24" BELOW GRADE TO WITHIN 3" TO 6" OF CAD-WELD TERMINATION POINT. THE EXPOSED END OF THE CONDUIT MUST BE SEALED WITH SILICONE CAULK. (ADD TRANSITIONING GROUND STANDARD DETAIL AS WELL).

21. BUILDINGS WHERE THE MAIN GROUNDING CONDUCTORS ARE REQUIRED TO BE ROUTED TO GRADE, THE CONTRACTOR SHALL ROUTE TWO GROUNDING CONDUCTORS FROM THE ROOFTOP, TOWERS, AND WATER TOWERS GROUNDING RING, TO THE EXISTING GROUNDING SYSTEM. THE GROUNDING CONDUCTORS SHALL NOT BE SMALLER THAN 2/0 COPPER. ROOFTOP GROUNDING RING SHALL BE BONDED TO THE EXISTING GROUNDING SYSTEM, THE BUILDING STEEL COLUMNS, LIGHTNING PROTECTION SYSTEM, AND BUILDING MAIN WATER LINE (FERROUS OR NONFERROUS METAL PIPING ONLY). DO NOT ATTACH GROUNDING TO FIRE SPRINKLER SYSTEM PIPES.



**dish** wireless.

5701 SOUTH SANTA FE DRIVE
LITTLETON, CO 80120

**WESTCHESTER** SERVICES LLC

JOHN M. BANKS ARCHITECT

STATE OF MICHIGAN
JOHN M. BANKS
ARCHITECT
40268
LICENSED ARCHITECT

| DRAWN BY: | CHECKED BY: | APPROVED BY: |
|---|---|---|
| CG | ST | JMB |

RFDS REV #:          1

CONSTRUCTION DOCUMENTS

SUBMITTALS

| REV | DATE | DESCRIPTION |
|---|---|---|
| A | | ISSUED FOR REVIEW |
| 0 | | ISSUED FOR PRELIM/CONSTRUCTION |
| 1 | | ISSUED FOR REVIEW/CONSTRUCTION |
| 2 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 3 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 4 | | ISSUED FOR PERMIT/CONSTRUCTION |
| 5 | | ISSUED FOR PERMIT/CONSTRUCTION |

A&E PROJECT NUMBER
DEGRR0001458

DISH Wireless L.L.C., LLC.
PROJECT INFORMATION

DEGRR0001458
WCWD BUILDING
50 LOUIS ST NW
GRAND RAPIDS, MI 49503

SHEET TITLE
GENERAL NOTES

SHEET NUMBER
**GN-5**

EXHIBIT D

LANDLORD'S CONSTRUCTION RULES AND REGULATIONS

The following rules and regulations apply to contractors and subcontractors performing construction in or around the Structure directly or indirectly contracted by either the Tenant:

1.  Where Tenant chooses to employ its own contractors, all work to be performed shall be at the risk of the Tenant and those contractors.

2.  A project schedule must be submitted to the Landlord's property manager ("**Landlord's Representative**") prior to commencement of work. Landlord's Representative shall be notified of all schedule revisions.

3.  Window/Glass film signage should be furnished to Landlord for final inspection and approval prior to production and installation. Photo provided to Landlord upon completion.

4.  In addition to contractual obligations, contractor will furnish to Landlord's Representative prior to commencement of construction the following items:

   A.      Copy of the Building Permit and any project scope specific permits; and

   B.      Certificate(s) of Insurance from each contractor and its subcontractors;

The coverage indicated below must be provided through an insurance company, which carries an A. M. Best rating of no less than "A-". A certificate evidencing the coverage noted below shall be on file with Landlord's Representative prior to the commencement of the work and shall provide for thirty (30) days prior written notice of cancellation (or ten (10) days' Notice of non-payment of premium) of coverage. This certificate must include additional insured language as noted in #4 below.

Access may be denied until Landlord's Representative receives evidence of all insurance coverage required.

   The minimum requirements acceptable are:

   1.      Commercial General Liability      $1,000,000 each occurrence
           Bodily Injury and Property Damage. $2,000,000 aggregate.

   2.      Automobile Liability Coverage    $1,000,000 combined single Bodily Injury and Property Damage
           limit each occurrence.

This coverage must include coverage for Owned, Hired, and Non-Owned Vehicles. If no owned vehicles, Hired and Non-Owned coverage is required.

   3.      Workers' Compensation - Statutory Requirements
           Employer's Liability Limit $500,000/$500,000/$500,000 per accident/disease/employee
           Statutory coverage as required by State of Michigan. If self-employed with no other employees, a qualified self-insured, or not required to carry Workers' Compensation, submit a letter stating this or a copy of certificate of self-insurance. A Waiver of Subrogation endorsement issued in favor of Landlord and CWD Real Estate Investment must be attached to the certificate.

Total Per Occurrence/Accident Limits for Commercial General Liability, Auto Liability and Employer's Liability Insurance may be satisfied by a party with any combination of primary and excess or umbrella liability policies totaling the amount of the required insurance.

4.    Additional Insured Endorsement
(Form B CG 2010 11/85 or equivalent) - this endorsement must be attached to the certificate with Landlord as the certificate holder at 50 Louis Street, NW, Suite 600, Grand Rapids, MI 49503 with Landlord and CWD Real Estate Investment as additional insureds.

The endorsement may include the following clause, or a separate endorsement may be issued (Primary coverage): "The insurance afforded by this policy for the additional insured(s) is primary insurance and any other insurance maintained by or available to the additional insured(s) is non-contributory"

The additional insured endorsement must provide coverage for "all operations" or "all operations performed for Landlord and CWD Real Estate Investment".

Landlord reserves the right to require additional persons and entities (including but not limited to other tenants of the Structure) to be named as insured from time to time.

C.    Contractor's License Number;

D.    One (1) complete set of approved and stamped drawings;

E.    A list of building materials to be used in the work which are to be supplied to the Structure; and

F.    A complete list of subcontractors (names and addresses) to be used in connection with the construction.

5. All public areas in the Structure affected by the construction must be adequately protected to prevent any damage. These areas shall include, but are not limited to, entry ways, corridors, lobbies and the elevators. Construction trades shall promptly repair any damage that it causes, at its cost.

A.    Contractors shall not leave any articles such as carpeting, pads or equipment in the public corridors.

B.    Contractors must use their own vacuum cleaner to vacuum up construction dust from public corridors and elevator carpets and wipe down solid surfaces and carpet base as necessary on a daily basis.

6. Contractors and subcontractors shall furnish adequate protection against personal injury to employees and public while work is in progress.

7. All materials moved into the Structure must be scheduled in advance. These materials shall be moved vertically via the stairs or the freight elevator. Use of the loading dock must be coordinated with Landlord's Representative.

8. The work shall be performed between the hours of 7:00 a.m. and 5:00 p.m., Monday through Friday, with holidays, Saturdays and Sundays excepted, unless permission is granted by Landlord's Representative to deviate from this time. Work, including but not limited to coring or drilling into the concrete slabs or any other noises that are deemed to be disruptive to the occupants of the building, is not allowed between the hours of 8:00 a.m.

and 5:00 p.m.  This work must be scheduled with the Landlord's Representative and performed between 5:00 p.m. and 7:00 a.m.  In the event the work will involve strong odors, the work will have to be performed after 5:00 p.m.

9.   During the progress of the work, all discarded materials, refuse, deliveries, etc., shall be cleaned up and removed from the site on a daily basis.  Upon completion of the work, all debris shall be removed from the Structure by the contractors or subcontractors.  Contractors are not permitted to use the Structure's dumpsters for construction debris.

10.  No signage will be permitted to be displayed in the Structure for advertising purposes.

11.  Contractors and subcontractors are responsible for security and lock-up of their construction areas.

12.  Contractors and subcontractors will act in a professional manner at all times.  See the attached Exhibit A – Work Rules regarding misconduct.

13.  Coring any floors requires providing Landlord's Representative with a sketch stating the exact locations of the cores from a structural base building reference point (i.e. column, shear wall) and remain subject to Landlord's approval.

14.  All mechanical work required to the building systems such as HVAC, electrical, life safety and plumbing, is to be submitted to Landlord's Representative for approval, not to be unreasonably withheld, conditioned or delayed beyond ten (10) business days from Tenant's request.  Contractors or subcontractors shall notify Landlord's Representative of scheduled tie-ins to base building systems.  All electrical panels and circuits shall be properly identified.  No structural modifications shall be made without Landlord's Representative's written approval.  Contractors will be held responsible for damage done to base building systems caused by its work.

15.  Contractors and subcontractors shall (i) protect the Structure and its HVAC system with temporary filtration during the construction process; (ii) be responsible for appropriate protection on all return air systems during construction; and (iii) be held responsible for damage it causes to the HVAC system if appropriate protection is not applied or maintained throughout the project.

16.  All the work is to be in accordance with the City (and other applicable) codes.

17.  Upon completion of construction, Tenant's contractor and/or architect shall provide Landlord's Representative with a set of "as built" plans (including, but not be limited to, electrical, plumbing and mechanical plans if such exist).

18.  Contractors are required to submit affidavits and final waivers of lien from contractors and all subcontractors covering labor and material and provide any applicable warranties and guarantees.

19.  Tenant's contractor or architect must furnish to Landlord's Representative verification of all final inspections by the City and a certificate of substantial completion/occupancy depending on scope of project.

20.  Contractors are charged with the responsibility for insuring that all of its subcontractors are informed of these Rules and Regulations, including Exhibit A – Work Rules.

21.  See Landlord Representative for applicable building hours.

22.  All workers shall use restroom facilities as designated by Landlord's Representative.

23. Landlord and Landlord's Representative may institute additional rules and regulations during the project.

EXHIBIT A
TO CONSTRUCTION RULES AND REGULATIONS

WORK RULES FOR CONTRACTORS, SUBCONTRACTORS
AND THEIR EMPLOYEES/ AGENTS AND EMPLOYEES/AGENTS OF THE TENANT

ACTS OR CONDUCT INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING ARE PROHIBITED AND CAN RESULT IN IMMEDIATE DISCHARGE BY THE LANDLORD.

1.       Coring or drilling into the concrete slab(s), or any other noises deemed to be disruptive to the occupants of the Structure between 8:00 a.m. and 5:00 p.m. or other times set by Landlord's Representative.

2.       No gas-powered equipment shall be used without proper ventilation.    Contractors or subcontractors to give Landlord's Representative prior notification before the use of any gas-powered equipment.

3.       Destroying or removing, without permission, any property belonging to the Structure, its occupants, or other contractors, subcontractors or workers.

4.       Fighting, creating a disturbance, horseplay or radio/CD playing.

5.       Reporting to work under the influence of narcotics, intoxicants or non-prescribed tranquilizers or pep pills or possession or use of such on site.

6.       Possession of firearms or other deadly weapons.

7.       Smoking is prohibited in the Structure.

8.       Falsely stating or making claims of injury.

9.       Loitering or roaming.

10.      Sale of food, beverages, or other merchandise.

11.      Cooking and unauthorized fires.

12.      Picture taking.

13.      Violation of safety rules.

14.      Abuse, defacement or destruction of the Structure or its occupants' property; posting of unauthorized signs.

15.      Misuse of fire extinguishers, safety, or fire prevention equipment.

16.      Failure to use assigned entrances/exit gates.

**IN THE CIRCUIT COURT FOR THE COUNTY OF KENT**
**STATE OF MICHIGAN**

CWD 50 LOUIS, L.L.C.,

                Plaintiff,

  v.

DISH WIRELESS, L.L.C.,

                Defendant.

Case No. 26-20705-CBB

**DEFENDANT DISH WIRELESS L.L.C.'S NOTICE TO THE CIRCUIT COURT FOR THE COUNTY OF KENT, STATE OF MICHIGAN OF REMOVAL OF ACTION TO THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

Defendant DISH Wireless L.L.C. has filed in the United States District Court for the Western District of Michigan, Southern Division, its Notice of Removal of the above-styled action to the United States District Court in accordance with the provisions of 28 U.S.C. §§ 1441 and 1446.  Attached hereto as Exhibit A and incorporated herein is a true and correct copy of the Notice of Removal and all papers and exhibits attached thereto.

Respectfully submitted this 11th day of June, 2026.

*/s/ Gina M. Dalfonso*
GINA M. DALFONSO (P84046)
Collins Einhorn Farrell PC
4000 Town Center, 9th Floor
Southfield, MI 48075
Tel.: (248) 351-5416
Fax: (248) 355-2277
Gina.Dalfonso@ceflawyers.com

*Attorneys for Defendant DISH Wireless L.L.C.*

**IN THE CIRCUIT COURT FOR THE COUNTY OF KENT**
**STATE OF MICHIGAN**

CWD 50 LOUIS, L.L.C.,

            Plaintiff,

   v.

DISH WIRELESS, L.L.C.,

            Defendant.

Case No. 26-20705-CBB

## CERTIFICATE OF SERVICE

Pursuant to Mich. Comp. Laws § 600.1971, I certify that I have this date served the foregoing *Defendant DISH Wireless L.L.C.'s Notice to the Circuit Court for the County of Kent, State of Michigan, of Removal of Action to the United States District Court for the Western District of Michigan, Southern Division* on all parties of record by filing the same with the Clerk of the Circuit Court for the County of Kent via the court e-file system, through e-mail, and by depositing in the United States Mail a copy enclosed in a sealed envelope with first class postage fully prepaid as follows:

HONIGMAN LLP

Brandon J. Wilson
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7616
bwilson@honigman.com

Dated June 11, 2026

*/s/ Gina M. Dalfonso*
 GINA M. DALFONSO
 (P84046)

2